IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

GRAPHIC PACKAGING                    Jacksonville, Florida
INTERNATIONAL, INC.,
                                     Case No. 3:10-cv-891-J-99TJC-JBT
        Plaintiff,
                                     December 1, 2010
vs.
                                     9:30 a.m.
C.W. ZUMBIEL CO.,
                                     Courtroom No. 10D
        Defendant.
_____


MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

        Shannon M. Bishop, RMR, CRR
        221 North Hogan Street, #150
        Jacksonville, Florida 32202
        Telephone:  (904)549-1307  Fax:  (904)301-6844
        dsmabishop@yahoo.com


(Proceedings reported by microprocessor stenography;
transcript produced by computer.)

<u>A P P E A R A N C E S</u>

PLAINTIFF'S COUNSEL:

        **KIRK W. WATKINS, ESQ.**
        **KEATS QUINALTY, ESQ.**
        Womble, Carlyle, Sandridge & Rice, PLLC
        271 Seventeenth Street NW, Suite 2400
        Atlanta, Georgia 30363-1017

        **RYAN R. FULLER, ESQ.**
        Akerman Senterfitt
        50 North Laura Street, Suite 3100
        Jacksonville, Florida 32202

DEFENSE COUNSEL:

        **GREGORY F. AHRENS, ESQ.**
        **P. ANDREW BLATT, ESQ.**
        **KEITH R. HAUPT, ESQ.**
        Wood, Herron & Evans, LLP
        2700 Carew Tower
        441 Vine Street
        Cincinnati, Ohio 45202-2917

        **RICHARD KYLE GAVIN, ESQ.**
        Liles, Gavin, Costantino & George
        225 Water Street, Suite 1500
        Jacksonville, Florida 32202

<u>E X H I B I T S</u>   <u>R E C E I V E D</u>

<u>Page No.</u>

Defendant's Exhibits Nos. 1 and 2.................... 110

<u>P R O C E E D I N G S</u>

December 1, 2010                                      9:33 a.m.

                         - - -

                COURT SECURITY OFFICER:  All rise.  The United
States District Court in and for the Middle District of
Florida is now in session.  Honorable Timothy J. Corrigan
presiding.  Please be seated.

                THE COURT:  Good morning.  This is the case of
*Graphic Packaging, et al.*, versus -- how do you say the
name, Zumbiel?

                MR. AHRENS:  Zumbiel.

                THE COURT:  Zumbiel.  Okay -- *C.W. Zumbiel*
*Corporation*.  The case is numbered 3:10-cv-891.

                Let me go ahead and get appearances.

                Mr. Fuller, as local counsel, will you make your
appearance and then introduce your colleagues, please.

                MR. FULLER:  Ryan Fuller of Akerman Senterfitt on
behalf of Graphic Packaging.  Kirk Watkins, lead counsel.

                THE COURT:  All right.  And who are -- your client
representatives are behind you there?

                MR. FULLER:  Yes.

                THE COURT:  Who are they?

                MR. FULLER:  Barry Biddle is corporate
representative.  And Tod Hoyme.

                THE COURT:  Thank you.

1          And, Mr. Gavin, would you do the honors, please,

2  on your side of the table.

3          MR. GAVIN:  Yes, Your Honor.  At the front table

4  to your far right is Mr. Ed Zumbiel, the client

5  representative.

6          THE COURT:  Okay.

7          MR. GAVIN:  In the middle is Mr. Drew Blatt with

8  the Wood, Herron & Evans law firm.  In front of me is

9  Mr. Greg Ahrens with the same firm.  And immediately to my

10  left is Keith Haupt, also from the Wood, Herron & Evans law

11  firm.

12          THE COURT:  Okay.  All right.  Well, good to see

13  everybody.  We're here today on a motion for preliminary

14  injunction.

15          (Judge confers with courtroom deputy.)

16          THE COURT:  We're going to see if we can get the

17  temperature down a little bit in here.  We're here today for

18  a hearing on a motion for a preliminary injunction.

19          And what I have done in preparation for the

20  hearing is to, of course, read the motion and the response

21  and familiarize myself with the attachments.

22          I've read, actually, some of them.  I've

23  familiarized myself with others, I guess would be a right

24  way to say it.  I won't represent to you that I've read each

25  and every word of each and every page that was given to me.

1        I also saw -- I guess there's been motion practice

2  that's come in since the filing of the motion.  And there

3  was a motion to dismiss, motion to strike, and then an

4  emergency motion, and an opposition to the emergency motion.

5  And I'm aware of all that.  And I'll deal with it as -- as I

6  need to.  I'll just deal with it as I need to.

7        So what -- typically in these injunction hearings,

8  although patent cases are a little different -- in these

9  injunction hearings I will just hear argument of counsel.

10  I've got the affidavits.  I've got the papers.

11        And, you know, we'll just do it off -- we'll do it

12  off of the papers.  I do have a few questions for you as you

13  go through.  I don't have a particular time in mind, but

14  I -- I can tell you that I've got hearings this afternoon.

15  So we're going to finish by lunchtime.

16        So I'm -- and I'm guessing, based on the fact

17  that -- I think we had people here yesterday and people here

18  this morning.  And apparently we've got show and tell and

19  all this kind of thing.  That's all fine.

20        But I'm almost certainly going to promise you you

21  won't get everything that you intended to do.  It's just not

22  going to happen.  So we'll do the best we can.  And I'll try

23  to be fair and give you a -- you know, give you a voice.

24  But we can't -- we can't try the whole case today, so -- and

25  the preliminary injunction format doesn't envision we will

1  do so.

2          So I think what I will do is start with the movant

3  and let you begin your presentation.  And then we'll kind of

4  go from there.

5          MR. WATKINS:  Thank you, Your Honor.

6          My name is Kirk Watkins, as I was previously

7  introduced.  I'm with Womble, Carlyle, Sandridge & Rice out

8  of Atlanta, Georgia.  And I represent Graphic Packaging

9  International, Inc., in this matter.

10          I have prepared a PowerPoint presentation to go

11 through with the court that I think explains our case -- our

12 case, if not succinctly, at least clearly.  And I will try

13 to move through that pretty quickly.

14          THE COURT:  Do you have an extra copy of it?

15          MR. WATKINS:  I do have copies, Your Honor.

16          THE COURT:  Yeah.  Why don't you give it to me,

17 and that way I can...

18          MR. WATKINS:  I will.  I have also extra copies

19 for the other side, an extra copy for them and one for the

20 clerk.

21          THE COURT:  Can you give one to -- thank you.

22 Appreciate it.

23          MR. WATKINS:  And one for the court reporter --

24          THE COURT:  Okay.

25          MR. WATKINS:  -- as well.

1      THE COURT:  I'm sure there's some significance to

2  the dog at the bottom.  Is that your, like, trademark or

3  something that you're -- what, you're like bulldogs or

4  something or...

5      MR. WATKINS:  Your Honor, we are.  We are --

6      THE COURT:  Really?  Really?

7      MR. WATKINS:  We adopted that back in the 1990s.

8  That's -- the dog's name is Winston.  And it's been our --

9  we put that on all of our marketing materials and our

10  brochures that we solicit our clients with.

11      THE COURT:  As evidence that you mean business?

12      MR. WATKINS:  That we mean business, yes, Your

13  Honor.

14      THE COURT:  All right.  Well, okay.  So it has

15  nothing to do with the case?  This is advertising for your

16  firm, not -- it has nothing to do with the case?

17      MR. WATKINS:  It is the background only for the

18  slides, Your Honor.

19      THE COURT:  All right.

20      MR. WATKINS:  It does not have to do with

21  specific --

22      THE COURT:  I'm not used to seeing commercials for

23  law firms in their submissions.  But if that's the way y'all

24  do it -- it must be different up in Atlanta, I guess.

25      All right.  Go ahead.

 1          MR. WATKINS:  All right.  Thank you, Your Honor.
 2  We would -- if we could turn on the -- and turn to the
 3  first?
 4          This, Your Honor -- as you're familiar from
 5  reading the papers -- is an intellectual property dispute
 6  between two competitors.
 7          Zumbiel has been producing two-by-six beverage
 8  cartons, which Graphic claims are infringing other patents,
 9  for years.
10          There is a case -- cases in Atlanta relating to
11  that.  One of those cases has been pending for six years
12  now.  And it was put in re-examination.  Those patents were
13  in.  They're about to come out.  Zumbiel is now poised to
14  introduce --
15          THE COURT:  How many other -- are there other
16  cases?
17          MR. WATKINS:  Yes, Your Honor.
18          THE COURT:  Where are they?
19          MR. WATKINS:  In Atlanta.
20          THE COURT:  Is that -- why are they there and this
21  one here?  Is that because that's where the customer is?
22          MR. WATKINS:  The only -- the customer had a test
23  market here in Jacksonville and in Columbus, Ohio.  And we
24  chose the jurisdiction where the product that is involved in
25  this lawsuit was marketed.

1          THE COURT:  From a venue standpoint, where could

2     you have filed it?  What would be -- what were your options?

3          MR. WATKINS:  Our options as we understood them --

4     I'm not sure we knew exactly where in Ohio it had taken

5     place.  But it would be wherever the test market had been in

6     Ohio.  We did know that it was shipped to a plant here in

7     Jacksonville.  And so that was where we felt was the best

8     place for the --

9          THE COURT:  The reason I ask is I have -- I have a

10    number of contact lens patent cases.  And every time they

11    get mad at each other, they file another lawsuit, but they

12    always file it in my court.

13          I didn't know -- I mean -- I mean, I've got like

14    eight of them, you know.  And I'm just kind of wondering

15    why -- if y'all are -- if y'all are consistently upset with

16    each other, why don't you file it all with one court and one

17    judge so that you can -- so he can keep track of it?

18          MR. WATKINS:  Well, Your Honor, this patent is a

19    different patent family than the other ones that were filed.

20    The ones that were filed in Atlanta, that's where our

21    company's headquarters are based.  And that's, of course,

22    our preferred jurisdiction there.  But we felt like --

23    ensure that we had jurisdiction and venue that it would be

24    appropriate to file this one here.

25          THE COURT:  I know they're pretty shorthanded up

1  in Atlanta, too, aren't they?  I think they're short about

2  four or five judges up there.

3          MR. WATKINS:  We are short in Atlanta, Your Honor.

4          THE COURT:  We're pretty short here, too, but --

5  but not quite as bad as them, so -- all right.  Go ahead.

6          So you're -- and the reason I asked was I couldn't

7  tell -- you say it's an unrelated family of patents?  Is

8  that what you're saying?

9          MR. WATKINS:  Yes, Your Honor.  They claim -- they

10  have different claims.  They have a different priority date.

11  They make different assertions.

12          THE COURT:  I mean, if I looked at a finished

13  product, would I -- would I conclude they were unrelated

14  or -- or are you just saying that the patents are unrelated?

15          MR. WATKINS:  The patents are unrelated, but, in

16  addition, if -- if -- once you've become familiar with this

17  case and you've looked at the cartons, you would also say

18  that the cartons were unrelated.

19          THE COURT:  Okay.  Go ahead.

20          MR. WATKINS:  All right.  Your Honor, at this

21  point Zumbiel is poised to introduce a new two-by-six Zipper

22  Pack carton with a major beverage company.

23          It was our understanding from the information we

24  had received that that was likely to happen in the first

25  quarter of 2011.

1    From testimony that we received on Monday and from

2 the declaration of Mr. Zumbiel in this case, it appears that

3 it -- a full-scale launch might not happen until the end of

4 the year.

5    However, Mr. Zumbiel testified on Monday that if

6 Dr. Pepper ordered the same 7-Up carton for Diet 7-Up that

7 had been used in the test market, that he could begin

8 producing that particular product immediately.  So there is

9 some urgency in that regard.

10    THE COURT:  Is that likely to happen?  They said

11 in their papers that -- are we allowed to say their name?

12 We've been calling them the customer.  And you just called

13 them something else.  And I couldn't tell if it was a big

14 secret or what.

15    MR. WATKINS:  We can mention their name, Your

16 Honor.  We can't talk -- there's certain things about them

17 we can't mention.  But since the carton itself is in

18 evidence already with their name on it, we can.

19    THE COURT:  Okay.  Because I got used to calling

20 them the customer.

21    MR. WATKINS:  Well, I'll be happy to do that.

22    THE COURT:  All right.  And the -- I guess -- I

23 mean, basically, your opponents say, a, they haven't ordered

24 any more since they did the test and, b, if they do, it's

25 going to take them a while to get geared up.  And we're

1 talking fourth quarter of 2011 and we're in the fourth

2 quarter of 2010.

3          I was looking at this.  And, you know, I don't

4 prejudge anything.  But it looked like -- unlike some of the

5 other cases I've had, it looked like we had few, if any,

6 *Markman* issues.

7          So that takes -- that's six months that we save,

8 six or eighth months that we save, at least based on my

9 other experiences.

10          And -- and, frankly, in comparison to some of the

11 other cases I've had, while this has its complexity, it's --

12 it's at least something that probably I can wrap my head

13 around a little quicker than the chemical formulas for

14 contact lenses or something along those lines.

15          I'm just wondering -- instead of having a

16 preliminary injunction hearing, why don't we just have a

17 trial?  Why don't we go to trial in six months or eight

18 months and be done with it?

19          If that's what -- and I don't mean be done with it

20 in a -- I just mean, what's the point -- if they're not

21 going to launch this thing for a year and -- and we're not

22 going to have *Markman* issues, I can't imagine a trial -- I

23 mean, how long is a trial going to take, three or four days?

24          MR. WATKINS:  I would agree with that assessment,

25 Your Honor.  And I also agree with your timetable.  And I

1 think there's a lot of attraction to what you're saying.

2       We learned some things since Mr. Zumbiel filed his

3 declaration.  And that was at his deposition on Monday,

4 which has caused us a greater concern.

5       One is that if the customer requested that they

6 launch the -- gradually transition into the product, as

7 opposed to launching everything at one time, instead of

8 being 12 months from now, it would be one day.  They could

9 launch it in one day.  They already have the artwork.  They

10 already have the presses.  They could be delivering product,

11 according to his deposition, the very day it was ordered.

12       In addition to that, Your Honor, we have

13 discovered -- and it was verified in his deposition -- that

14 they are actually shipping this pack to another customer.

15 There's another customer that they have been selling the

16 Zipper Pack to and have been selling it for some time and

17 are selling it now.  So we would be asking for an injunction

18 against that.

19       It was not disclosed in the declaration they

20 filed.  However, when we were preparing for the deposition,

21 we noticed there was an image of it on their website.  They

22 confirmed that not only is that a product that they are

23 publishing on their website, but it's one they are actively

24 selling to Kroger.  And so, Your Honor -

25       THE COURT:  Did you bring a -- did you bring an

1 example?

2     MR. WATKINS:  Yes, Your Honor.

3     THE COURT:  Can I see it, please?

4     MR. WATKINS:  Of the one -- the Kroger one?

5     THE COURT:  Well, the one that you're accusing.

6     MR. WATKINS:  Yes.

7     THE COURT:  Either one.

8     MR. WATKINS:  I have a picture of it.  Is that --

9     THE COURT:  No.  I meant did you bring one.

10     MR. AHRENS:  Your Honor, I'd be willing to let you

11 have a look at my --

12     THE COURT:  Sure.  That's fine.  I just want to

13 see what it looks like.  You know, it's hard to read

14 about -- it's hard to read about a three-dimensional object.

15 I mean, you know -- I mean -- and, of course, I'm just

16 generally familiar with it, but...

17     So what am I looking at here?  Am I looking at the

18 accused?

19     MR. WATKINS:  Yes, Your Honor.

20     THE COURT:  The embodiment?

21     MR. WATKINS:  That's my understanding.  I have not

22 been provided that, but I can -- if you'll show me the other

23 side -- yes, Your Honor.

24     THE COURT:  Okay.

25     MR. WATKINS:  That is the embodiment that is used

1  for the Dr. Pepper product.  It is similar, though not the

2  exact same size, as the product that is used for the Kroger

3  water -- cylindrical water bottles.

4          THE COURT:  And do you have one of yours?

5          MR. WATKINS:  Your Honor, we're not -- we have our

6  patent.  We're not commercially producing that product,

7  so...

8          THE COURT:  You haven't -- you haven't started

9  producing it?

10          MR. WATKINS:  That's correct, Your Honor.

11          THE COURT:  Okay.

12          MR. WATKINS:  I do have a picture of the Kroger --

13          THE COURT:  So the thing -- so when you're -- when

14  you're talking about the customer and your relationship,

15  which apparently is -- I got from reading -- I may be

16  wrong -- is relatively longstanding and significant to your

17  company, you're not -- the products that you were providing

18  to them don't include an embodiment of the patents that

19  you're trying to protect in this case?

20          MR. WATKINS:  That is correct.

21          THE COURT:  I don't think I understood that.

22          MR. WATKINS:  Right.  Well, let me tell you --

23  explain what the situation is on that and the relevancy of

24  the product.

25          We are providing a carton.  And this is where --

1    when you asked the question is our carton -- is it a related

2    carton?  It is related to the extent that the carton we are

3    providing to Dr. Pepper, which they seek to replace with a

4    Zipper carton, is also a two-by-six.  And it does have an

5    opening feature.  It's an opening feature that's covered by

6    the other patents, not by the patent that's at issue in this

7    case.

8              THE COURT:  The other patents being the ones that

9    are up in Atlanta that went for re-examination and all that?

10             MR. WATKINS:  That's correct, Your Honor.  So

11   we're at a situation where the -- if you will, those --

12   those cases are in the end game, to use a term.  And it may

13   very well be that Zumbiel, in the immediate future, will be

14   prohibited from producing or selling those cartons.

15             THE COURT:  They don't seem to think so, by the

16   way.

17             MR. WATKINS:  That's true.

18             THE COURT:  Yeah.

19             MR. WATKINS:  That's true.

20             THE COURT:  I mean, their papers say what -- I

21   think -- what I got out of their papers was that y'all got

22   hurt in the re-examination and that -- that they don't

23   accept the premise that they're going to be -- but I guess

24   y'all just have a different view of that, right?

25             MR. WATKINS:  Well, actually, Your Honor, what was

1  said in Mr. Zumbiel's declaration is accurate.  But there

2  were two re-examinations.  And in one of the re-examinations

3  the claims that we were asserting against them were not

4  allowed as originally written, and, therefore, that ends the

5  allegations of infringement on those.

6         In the other re-examination the patent office did

7  allow claims that were -- as written, that read on the

8  Zumbiel patent.  And their only recourse at this time is to

9  appeal the -- the decision of the patent office to take it

10  up to the Federal Circuit.

11         Now, there is a motion for reconsideration we have

12  filed on some of the other claims that weren't allowed, but

13  they did not file a motion for reconsideration.  And so

14  their only avenue at this point is to go up to the Federal

15  Circuit.

16         So we think that's going to be a fairly quick

17  process.  And unless the Federal Circuit reverses the patent

18  office, then those claims --

19         THE COURT:  Going to the Federal Circuit is quick?

20         MR. WATKINS:  It can -- it's a matter of a few

21  months.

22         THE COURT:  Really?

23         MR. WATKINS:  It's not -- often it is.  Yes, Your

24  Honor.

25         THE COURT:  Because, I mean, I've got -- I've got

1   those contact lens cases up there.  And they've been up

2   there a year.  And I think they're just finishing the

3   briefing, I mean, so -- and I was told the median time was

4   like 18 months or something to get a decision.

5           MR. WATKINS:  Well, that -- my more recent

6   experience was not that long, but it may have been -- we

7   actually got a ruling that was -- that was ruled on the same

8   day that we argued, which is also unusual in the Federal

9   Circuit.  So there --

10          THE COURT:  Did it go your way?

11          MR. WATKINS:  It did, Your Honor.

12          THE COURT:  That's why you remember it.

13          MR. WATKINS:  Absolutely.  I might not have

14  brought it up otherwise.

15          THE COURT:  All right.  Okay.  We used to talk

16  about the order of beating you back to the courthouse.  I

17  guess that's the equivalent, right, beating you back to your

18  office?

19          MR. WATKINS:  It certainly felt that way.

20          THE COURT:  I'm looking -- you know, I'm looking

21  at this PowerPoint as I'm going through.  And I appreciate

22  it.  And it would be helpful to me.

23          But as you can see, I'm not very good at doing

24  this on a PowerPoint, because I -- I have questions and so

25  forth, and so -- and so I'm not going to stop you from doing

1  it, because I do want to hear what you have to say.  But can

2  we skip over the public interest and the four factors and

3  all that and kind of get to it, because I --

4          MR. WATKINS:  We certainly can, Your Honor.  There

5  is a point I wanted to make up on the second -- on the third

6  slide, which is -- no, it's the one above that, actually.

7          It's the first point on that slide.  And I think

8  this is very important because the only defense to some

9  claims are that there are substantial alternative uses to

10 this carton.  In other words --

11         THE COURT:  Is that the only defense?

12         MR. WATKINS:  To certain of the claims, other than

13 the unenforceability by virtue of --

14         THE COURT:  But you're saying on infringement --

15 because I was trying -- I knew that was an issue they had

16 raised.  But I guess I hadn't done the work to see which --

17 which claims they had applied to it.

18         MR. WATKINS:  The '551 claims, 23, 33, I think,

19 and 43, they're asserting that they're substantial

20 alternative uses for the carton.  Now, what --

21         THE COURT:  Because you could put juice boxes in

22 them?

23         MR. WATKINS:  You could put juice boxes in -- the

24 example Mr. Zumbiel used in his deposition, you could put

25 marbles in them.

1      THE COURT:  Before you frame them up, you could

2 probably use them for a doormat.

3      MR. WATKINS:  You know, that's been suggested on

4 our side that that is a possibility.  But we don't think

5 that's a substantial alternative use, particularly when --

6      THE COURT:  Well, I felt like maybe that's why

7 they -- and I -- of course, I'll talk to them.  But I felt

8 like maybe that's why they led off with their defenses.

9      My experience has been that when people in patent

10 cases lead off with their defenses that -- that they have

11 less to say about infringement.

12      MR. WATKINS:  Your Honor, we -- we agree with

13 that.  And I'm not going to spend a lot of time on it.  But

14 I did want to point out that very first thing.  When they

15 deliver the carton blank, whether it's to Kroger or to

16 Dr. Pepper, it already has printed on the outside what's

17 going to be put in it.

18      So their argument is basically Dr. Pepper could

19 put marbles in a container that says it's got 7-Up cans in

20 it.  And that -- and we don't think that's a reasonable or

21 practical or an alternative use.

22      THE COURT:  What does the case law say about that?

23 In other words, what is --

24      MR. WATKINS:  I will mention that --

25      THE COURT:  If it's -- I'll just ask it this way.

1  I'm going to use a word that probably isn't going to be a

2  good word, because obviousness has a separate meaning in

3  patent law, but I'm using it as a layperson.

4          If it's obvious this is what it's supposed to be

5  used for, the fact that it could be used for something else,

6  is that enough to show that there are other substantial

7  noninfringing uses?  Or what's the case law say?

8          MR. WATKINS:  No, Your Honor.  The case law does

9  not say that.  The case law says that it's -- and I've got a

10  quote in here.

11          THE COURT:  See, this is why I don't like

12  PowerPoints, because -- because people get -- you know,

13  they -- they've got everything so ordered that they can't go

14  out of order.  Go ahead.

15          But it's nice to have, because after the

16  hearing -- sometimes I -- I wish people would give these

17  before the hearing so I could read them.  And then I would

18  know what you're going to say.

19          MR. WATKINS:  Well, Your Honor, I would have loved

20  to have done that.  I must confess it was finished rather

21  late last night and I --

22          THE COURT:  Well, maybe one of the squad of

23  lawyers you have over there will find your case while you're

24  talking to me.

25          MR. WATKINS:  Yeah.  I can certainly -- I can

1   certainly -- I've got that in there.

2         THE COURT:  Well, anyway, tell me what you think

3   the law is on that.  What's the -- I mean, because I -- I

4   suppose it's true that literally patented patents, if you

5   construct them, can be used for something else.

6         I mean, you could probably use it for a wind

7   ornament, too, if you put it up in your house and it blew

8   around, but -- so I guess what -- how do you -- how do

9   you -- how do you evaluate how far away you have to get from

10  the -- the obvious use of it in order to have it not fall

11  within the substantial doctrine?

12        MR. WATKINS:  Your Honor, it can't be impractical

13  or unreasonable or an unanticipated use.  It's got to be --

14        THE COURT:  Here it is.  District courts have

15  found, and we agree, that noninfringing uses are substantial

16  when they are not unusual, farfetched, illusory,

17  impractical, occasional, abhorrent, or experimental.  Is

18  that what you were looking for?

19        MR. WATKINS:  Thank you.  I appreciate your

20  dexterity.

21        THE COURT:  All right.  And so you're saying that

22  their marble example would fit within the farfetched?

23        MR. WATKINS:  Exactly, Your Honor, especially when

24  you consider the fact that the carton is already printed

25  showing it's got cans inside.

1          In fact, another key point on that is there's

2    testimony from -- from the -- from their -- if you read

3    their brief, it says, It should be noted that Zumbiel's

4    Zipper Pack carton blanks are capable for being used for

5    noncylindrical containers.

6          And in Mr. Zumbiel's deposition he revealed --

7    question:  Is Zumbiel currently producing a Zipper Pack

8    carton for cylindrical objects?

9          Answer:  Yes.

10          Okay.  And for what company or companies is that

11   being produced for today?

12          It is being produced for the Kroger Company.

13          And what is placed by the Kroger Company in those

14   cartons?

15          PET bottles of water.

16          And on the next page I also ask him, question:

17   Would you agree if 7-Up cans were pictured on the carton

18   that the only substantial use for that carton by Dr. Pepper

19   would be to put 7-Up cans inside it?

20          His answer:  I think that's a safe assumption,

21   yes.

22          So I believe that that issue is pretty much put to

23   rest by that testimony and the case authority, as well.  And

24   if we have up on the --

25          THE COURT:  So does that mean, then, that -- even

1  putting aside the other issues, if I determine that you're

2  substantially likely to prevail on -- on those claims and

3  that their -- that their position that they're a substantial

4  noninfringing use is not -- not likely to -- to carry the

5  day, then that would be enough to find infringement?

6          MR. WATKINS:  Certainly, Your Honor, yes.

7          THE COURT:  So you don't have to get to the other

8  issues, which are -- seem more problematic to me.

9  Because -- only because it's hard to really -- it's hard to

10 read the patent and really understand what -- you have to

11 actually almost sketch it out.  Otherwise, you can't even

12 understand, in my mind, what you're saying.

13         And that may be inherent in the -- and maybe after

14 I do it three or four more times, it may be I'll get better

15 at it.  But that may be inherent in trying to describe a

16 construction of a -- of an object like that, but -- and I

17 don't know what the standards are.

18         Obviously, there has to be some ability to be

19 clear enough so that you get it patented.  But I guess I

20 found those other ones a little more difficult to parse

21 through.

22         MR. WATKINS:  Yes, Your Honor.  And that's why I

23 think it's important to look particularly at claims 23, 33,

24 and 43 of their -- of the '551 patent.  Because what they're

25 basically -- they're not quarrelling with the -- at this

1  point in time, they're not quarrelling with the construction

2  of the terms.

3          They have two basic defenses to that.  One is

4  there's substantial alternative use.  And the second is that

5  it's -- it is inequitable -- that inequitable conduct was

6  committed by the failure to disclose certain --

7          THE COURT:  Were you the patent counsel?  Or was

8  that somebody else?  They keep referring to patent counsel.

9  But I didn't -- I didn't see that the people were

10  identified.

11          MR. WATKINS:  Your Honor, that -- that's correct.

12  They were not.  And that's part of the motion to dismiss.

13  Their geographic packaging has a number of outside patent

14  counsel in our firm.

15          We have -- they have over 1,000 patents.  And we

16  have a number of people working on patents.  I'm the

17  litigator.  I'm not patent counsel.  I'm sort of like you,

18  I've been looking and studying these things for ten years

19  and I still need to talk with somebody on -- to understand

20  how it all fits together.

21          And, hopefully, they've empowered me to be able to

22  explain that in this case, which I think is, like you said,

23  somewhat easier to get your mind around than chemical cases.

24          THE COURT:  And I guess on inequitable conduct --

25  and I know I'm moving you around.  But that was their

1  lead -- that was their lead argument.  So I assume most
2  people usually lead with the argument that they think is the
3  strongest.

4          So I -- so that's -- and we had a -- kind of an
5  anomaly because -- of course, you filed your motion.  You
6  said why it was infringing, why there was irreparable harm.

7          You did all -- you didn't talk about potential
8  defenses.  They -- they respond and they lead off with the
9  defenses of unenforceability and invalidity, to which you
10 had not -- you had briefed that.

11          And you didn't have to file a reply, but instead
12 you, like, replied to the counterclaim and verified it and
13 you put stuff in the exhibits.  And you -- it looked to me
14 like you were trying to reply.  But why didn't you just ask
15 me to file a reply so that -- because I -- I would have
16 readily granted it.

17          Since I had no -- I had no information from you as
18 to what your position was on these defenses, I would have
19 been happy to give you a reply.

20          MR. WATKINS:  Well, let me respond to that,
21 because I think it is appropriate for me to respond to that.
22 Your Honor, first of all, we did -- it was our intent with
23 filing our answer to the counterclaim to provide the other
24 side, and hopefully the court, with as much notice as
25 possible as to what we saw as the issues in their -- in

1 their allegations against us.

2       And we talked to the other side.  And we had

3 already seen issues -- we immediately talked to the other

4 side after receiving their response that we wanted to take

5 Ed Zumbiel's deposition, because we felt that there were

6 some things in his declaration that we needed to

7 cross-examine him on.  And that was set up for Monday of

8 this week.

9       And we knew -- or we highly expected that we would

10 be finding things out in the Zumbiel deposition that we

11 wanted to get before the court, which was the case.

12       And at that deposition, we requested opposing

13 counsel to allow the depositions to be used, and to also

14 allow the verified reply to be used.

15       And we also took with us to Cincinnati, to the

16 offices of the defendant, our -- the person who had verified

17 the counterclaim, and put him on for a deposition, also, on

18 Monday, to enable them to cross-examine him on all of the

19 points that we had made in our counterclaim.  And they did

20 cross-examine him on that.

21       We asked them to allow those things to be utilized

22 at the hearing.  And they objected to that.  And then we

23 immediately, that day, did file our request.  And some --

24 and our problem was that we thought we were going to have

25 additional information that we wanted to put before the

court that would be a result of the Zumbiel -- Ed Zumbiel

deposition on Monday, and potentially as a result of their

cross-examination of our client on Monday.

            THE COURT:  Well, maybe we're just hurrying too

fast.

            MR. WATKINS:  Your Honor --

            THE COURT:  That's what I -- that's what I'm --

you know, I guess y'all filed this because you thought that

they were getting ready to do something, but it turned out

maybe they're not quite getting ready to do it as much as

you thought.

            I don't know about this Kroger thing.  That wasn't

even mentioned in the papers.  You're saying that's

something you just learned recently?

            MR. WATKINS:  Learned Monday.  I mean, we saw it

on the internet site.

            THE COURT:  I mean, you know, it's a little bit --

little bit hard to think that you're going to take a

deposition -- important depositions on November 29th and be

ready to present them on December the 1st, isn't it?  I

mean...

            MR. WATKINS:  Well, Your Honor, it's very

difficult.  But that was the earliest date that we could

get.  I mean, they didn't file their response until November

15th.  We had Thanksgiving after that.

1          THE COURT:  I understand.  But that's the nature

2   of preliminary injunction practice.  You either have to go

3   with what you've got, which I always -- almost always think

4   is a mistake, because I think people fire too quickly and

5   then they don't have the -- they don't have what they need

6   to prove their injunction, or you've got to say, I'm going

7   to go slower but I'm going to get the information I need,

8   and then I'm going to present it in a -- in a good way.

9          And, you know, now we're a little bit betwixt and

10  between.  I mean, you're telling me that there's important

11  information in depositions which I don't even have or -- and

12  one of them you said you couldn't even give me because it

13  was confidential.  I didn't think that meant I couldn't read

14  it, but I --

15          MR. WATKINS:  I don't think it does either, Your

16  Honor.  In fact, I'm sure it doesn't.

17          THE COURT:  So, I mean, I'm not going to tell

18  anybody.

19          MR. WATKINS:  Well, let me, Your Honor -- if I may

20  respond to the gist of what you're saying.  Number one, this

21  is a very interesting case in terms of our filing for

22  preliminary injunction, because we didn't know exactly what

23  their timetable was.

24          And our -- the information we had was that it was

25  a much quicker timetable than it is.  When I filed it and

1 talked to opposing counsel, I agreed with them to give them

2 as much time as they wanted to respond and agreed to respond

3 within two weeks after that.

4    And the -- the dates that we arrived at turned out

5 to be November 15th with the -- with the November -- with

6 the depositions not being able to set until November the

7 29th.

8    And the court was acting promptly.  And we had

9 indicated to the court that we -- we were not in a rush for

10 the hearing.  But we got -- we got a prompt hearing date set

11 almost immediately.

12    THE COURT:  Yeah.  See, I didn't really get that.

13 Really, I've got other things to do, like lots of other

14 things to do.

15    MR. WATKINS:  I -- I understand.

16    THE COURT:  And so what the -- what the order --

17 as I recall it, it said no earlier than November 22nd, or

18 something like that, right?

19    MR. WATKINS:  It --

20    THE COURT:  It said, Response November 15th and a

21 hearing no earlier than November 22nd.  But I always assume

22 when people are filing for preliminary injunctions that

23 they're wanting a hearing.

24    And that was the -- certainly the impression I

25 got -- didn't I have a status with you-all?  Didn't I -- or

1  didn't I do something to schedule this?  I can't remember

2  what I did.

3          MR. WATKINS:  I don't believe we've had a status.

4          THE COURT:  But -- anyway, if you want to be here

5  two months from now, either to try it or to -- I couldn't

6  try it in two months.  I could have a preliminary injunction

7  hearing two months from now.

8          I could have a trial in probably -- if you get me

9  past April or May, I could probably give you a trial and

10 we'd know the answer.  So if I'm going too fast for you,

11 really, it wasn't my -- it wasn't my intent to do so.

12         MR. WATKINS:  Your Honor, you're not going too

13 fast for me at all.  We are completely ready and we have our

14 evidence.  We haven't been able to get it to you as fast as

15 you might want it, but we have it.  And it's available and

16 it will be -- it will be -- it's available today, so...

17         THE COURT:  So what -- so, for example, just give

18 me a -- give me a for instance.  You told me that one of the

19 depositions you took has dynamite information on your

20 irreparable harm argument.

21         So tell me what -- give me your best thing that

22 you got out of that deposition on irreparable harm.  Because

23 that's one of the issues that I'm looking at pretty hard, as

24 to whether we're premature or whether there's really been a

25 showing of irreparable harm as -- as the cases seem to

1  require now.  And so tell me what -- tell me what you found

2  out.

3        MR. WATKINS:  There's two points on that, Your

4  Honor.  The first point is that there are current sales

5  taking place to Kroger.

6        So we are being damaged in that a carton

7  infringing our -- our patent is being sold to Kroger on a

8  daily basis ongoing.  It's right now being sold.  It's not a

9  matter that we're going to be able to wait two months and

10 then address it.

11       They'll be -- as Mr. Zumbiel said in his

12 deposition, if there's no court order stopping me and the

13 customer wants something, I'm delivering it.  I'm doing

14 everything I can to get it there as fast as possible.

15       And the other thing that he said -- not in his

16 declaration, but in his deposition -- was if Dr. Pepper

17 wants the 7-Up carton, I can deliver it today.

18       So though the declaration gave the impression

19 there's no urgency, there's no need for an injunction for

20 eight or nine months, the deposition indicated that if

21 Dr. Pepper said go, that Zumbiel would not only be able to

22 go, but would be able to deliver product in one day.

23       And so we do have a sense of urgency here and

24 irreparable harm.  We have -- Your Honor, we have a

25 situation that I can't disclose the full range of it here in

the courtroom, but we have a situation with regard to our

relationship with Dr. Pepper that relates to the ongoing

nature of that relationship.

        And if that relationship is to be ongoing, we need

to be able to compete fairly with our competitors and not

have the competitor using our intellectual property and not

paying a royalty, and undercutting our price and taking away

the relationship and the profits that we would obtain from

that.  So we've got a real -- a real problem there, as well.

        Finally, Your Honor, before their answer was

filed, I had sent an e-mail to counsel for Zumbiel.  And I

said, We would like some of -- I'd listed eight questions

that we would like to have answered.  And I asked them to

informally respond to those.

        I believe that was on November the 12th, when

their response was on November the 15th.  And in that

e-mail -- and I can provide a copy of that to the court.

        In the e-mail I asked them to provide us with the

information relating to Zumbiel's net worth and so forth, so

we could see whether or not they would be able to respond to

the damages that might be obtained in this case.

        I furthermore asked that they share that e-mail

with Mr. Zumbiel, who I was going to be deposing at the

earliest possible time.

        The e-mail was shared with Mr. Zumbiel.  But in

his deposition, despite his position with the company and being the representative today, he said he had no idea about the balance sheet of Zumbiel.  He didn't know anything about how much cash Zumbiel might have.  It could be less than a million.  It could be a hundred million, he said.  He did not know.  And, Your Honor, I found that a little bit farfetched to --

THE COURT:  Is Zumbiel a public company or is that privately held?

MR. WATKINS:  It's privately held, Your Honor. We're not able to obtain that information.  But we have -- we have -- we also established that a substantial part of their business is in two-by-six cartons.

And if they are prohibited in the Georgia case and in this case from selling the two-by-six cartons that they're currently selling, that that could have a dramatic impact on their profitability, and, presumably from that, their balance sheet, and they might not then be able to pay the damages that have accrued over the six years that they have been infringing that product.

THE COURT:  Yeah.  You know, the problem I have with that is -- wouldn't that be an argument made to the court in Atlanta?  I mean, did y'all seek preliminary injunctive relief in Atlanta?  And how can I use -- how can I use an issue in a lawsuit that I'm not a part of as a

1   reason to find irreparable harm in this case?  I'm --

2          MR. WATKINS:  Your Honor, what we're -- what we're

3   looking at -- or trying to look at and explore is what's the

4   capability of Zumbiel to respond to damages?

5          Even if we confined it to this case, they have put

6   on no evidence whatsoever that they have the ability to

7   respond to any amount of damages in this case.

8          We've asked the question informally.  We've asked

9   it by -- by deposition.  There's been no information

10  provided on that.  You don't have to look to the Atlanta

11  case.  That's background.

12         I think both parties will acknowledge it.  If we

13  do -- they say we won't win.  We say we will.  It could be

14  substantial -- certainly substantial damages over that

15  period of time, with millions and millions and millions of

16  dollars of cartons being sold.  But, regardless --

17         THE COURT:  So tell me -- give me an idea of what

18  the -- what the damages might be if -- if they -- let's say

19  that -- let's say that tomorrow the customer orders

20  full-scale -- whatever full-scale is -- production from

21  Zumbiel of this -- is it called a Zipper Pack?  Is that

22  right?

23         MR. WATKINS:  Yes, Your Honor.

24         THE COURT:  -- Zipper Pack and they start doing

25  that and they do it for a year.  What's -- what is your --

1  do you have an estimate of what the -- what the damages

2  would be?

3       MR. WATKINS:  And that's why it's irreparable,

4  Your Honor.  But I will tell you that it's over ten million

5  dollars in sales, first of all.

6       But the problem, also, is it affects -- cartons

7  are very much determined -- the cost is determined by the

8  volume you're running.

9       If you have -- your last -- your incremental

10 cartons are by far your most profitable cartons.  If you --

11 if you have to cut down your volume and not use all of your

12 presses and not run all of your cartons -- or running less

13 than full capacity, then it costs you more per carton.  And

14 you're either going to have to raise your prices to other

15 customers or make less money off of other customers, as

16 well.

17      In addition -- and the real key here that -- and

18 there's case law -- and we've cited that -- supporting it as

19 well, is the customer relationship.  There's a case that I

20 cited that says -- what happens a lot of times with these

21 infringing situations when you have two competitors up

22 against each other is one uses an infringing product that

23 the other competitor has the rights to.

24      And by the time the other competitor is able to

25 stop that infringing product from being -- continuing to be

sold, the relationship that that other competitor has

developed with the customer is such that they may switch to

a noninfringing product and keep the relationship they have,

even with a product that may be less than the product they

want because that customer has developed a relationship with

them.

And according to Mr. Zumbiel's testimony, using

the two-by-six carton that they have now and proposing the

Zipper Pack carton, they have moved from us being the

majority supplier to Dr. Pepper to them now being the

majority supplier to Dr. Pepper.  That is their biggest

single customer.

If this lawsuit stops them from receiving -- being

paid by that customer, then that customer may come to us.

They may go to them for a different product.  But either --

if we can't collect from them -- if the customer doesn't go

for them -- to a different product, then we're irreparably

harmed.

If the customer goes to them for a different

product because of the relationship they built by infringing

our product, we're irreparably harmed.

Irreparable harm -- it's, in part, the fact that

you can't measure it with precision.  And when you're

dealing with competitors competing and one is using the

other's intellectual property, irreparable harm is usually

1   not a big issue for the court to decide.

2          THE COURT:  Well, it didn't used to be.  But now

3   we've got *eBay*, right?  And it's amazingly unclear, I guess,

4   in the Federal Circuit -- we found one unpublished case -- I

5   think one of y'all cited it, or we found it, I'm not sure

6   which -- where the Federal Circuit seems to say that *eBay*

7   standards which apply on permanent injunctions also apply in

8   preliminary injunctions, which means there's no longer a

9   presumption of irreparable harm.

10          Are you accepting of that as the law?  Or are you

11  still thinking otherwise?  Or what?

12          MR. WATKINS:  Your Honor, I think that -- that

13  there are certain factors that come into play, certainly,

14  when the court is considering it.  And the fact that you

15  have competitors that are the two primary suppliers to a

16  single customer, dealing directly with each other, and

17  that -- and that they're -- the mainstay -- the main product

18  that one of the competitors proposes to sell or is selling

19  is an infringing product, then I think, certainly, the

20  irreparable harm scale in that circumstance has not been

21  changed by *eBay*.

22          THE COURT:  So you're -- I'm not sure that quite

23  answered my question, but I'll go -- I'll go beyond it for a

24  moment and come back.

25          You're saying that -- that the -- your argument is

1 that -- or you just said to me that Zumbiel is now the

2 majority provider to this particular customer taking over

3 from your firm -- from your company, but that -- that

4 doesn't -- they're not doing that with the infringing --

5 alleged infringing product, right?  That hasn't happened

6 yet.

7         MR. WATKINS:  They have done the -- they have done

8 the preliminary -- they've sold 400,000 cartons of --

9         THE COURT:  But that didn't make them the

10 majority, right?

11         MR. WATKINS:  No.  Not that alone.  The two-by-six

12 carton, though, is what they have that --

13         THE COURT:  And that's the thing up in Atlanta?

14 That's the thing -- the case up in Atlanta is -- is the --

15 is the elephant.  This is the smaller elephant, or not.

16         MR. WATKINS:  It may be the bigger elephant.  And

17 the reason is that's -- in our view, that's their end game,

18 that's what their plan is, to switch -- to hopefully keep

19 this lawsuit tied up, or keep being able to produce the

20 Zipper Pack when they're stopped from producing the other

21 two-by-six carton.

22         This is the alternative they proposed to

23 Dr. Pepper -- once the rulings came out by the PTO, this is

24 the alternative that they've proposed.  Let's go this route.

25 They came to Dr. Pepper, said, Let's do the Zipper Pack

 1  instead of the two-by-six.

 2          THE COURT:  In this type of patent litigation, I

 3  have to say, I don't think I've -- because this is a

 4  derivative or, I guess -- what's it called, contributory?

 5  Is that --

 6          MR. WATKINS:  Contributory infringement.

 7          THE COURT:  Because the truth of it is -- I guess,

 8  is that it's ultimately the customer that makes -- that uses

 9  and sells the product, right, or uses the product to sell

10  its product?

11          So what role, if any, does the customer play in

12  these cases?  They just stay out of it and let you-all fight

13  with each other or...

14          MR. WATKINS:  Actually, Your Honor, they're very

15  astute at that.  In fact, often the customers get

16  indemnification from the clients that if there's anything --

17  like in this instance, Zumbiel came to the customer and

18  proposed the carton.

19          The customer says, If there's any dispute over

20  this, you handle -- you handle it.  And generally what

21  happens is the competitors don't want to sue the customer

22  anyway.  So they sue the --

23          THE COURT:  I wouldn't think.

24          MR. WATKINS:  Right.  So they -- so the general

25  result is that the fight is between the competitors.

1          THE COURT:  But the customers don't care that
2    y'all are fighting with each other and using their name and
3    banding their -- their stuff around?  They don't -- they
4    don't mind that?

5          MR. WATKINS:  I wouldn't go that far at all, Your
6    Honor.  I think the customers -- sometimes they even
7    intervene.  Dr. Pepper has not intervened in the suits in
8    Atlanta.

9          It does not appear to be -- the apparent view from
10   Dr. Pepper is this is an intellectual property dispute
11   between our suppliers.  You resolve it.  That's every
12   indication that I think both sides have gotten, though I
13   would have to allow Zumbiel to speak for themselves on that.

14         THE COURT:  All right.  Let me -- because we're in
15   this post *eBay* world, where I do -- at least it appears to
16   me that both the district courts and the -- and the Federal
17   Circuit, at least in that one unpublished decision, seem to
18   suggest that in order to get a preliminary injunction in a
19   patent case, you've got to prove all four of the elements,
20   including irreparable harm, and it's not presumed, so -- and
21   then when I start to read about what irreparable harm is or
22   what you say it is, you say things like you're not sure
23   they're going to be able to pay, you're -- there might be
24   customer erosion issues.  And you -- you named three or four
25   things --

1          MR. WATKINS:  And there's price erosion issues.

2          THE COURT:  Price erosion issues.  You named those

3    things.  What I'm trying to understand in my mind, or trying

4    to think through in my mind, is what -- in the post *eBay*

5    world, what's going to -- what's going to constitute

6    irreparable harm and what's not?

7          In other words, what you're saying, it seems to

8    me, would be what anybody else might say, too, in this

9    situation.  And so how -- is it -- is it back to a

10   presumption?  Or how -- or what's your distinguishing factor

11   that might say irreparable harm exists in your case but it

12   may not exist in another case?

13         I don't -- I'm having trouble seeing what the

14   guiding principles are to determine whether irreparable harm

15   is established in a given patent case on a preliminary

16   injunction or not.

17         MR. WATKINS:  Well, I think that -- I think that

18   you're focusing on the correct things, Your Honor, and you

19   do need to look at -- I think there's some significant

20   factors here that are not significant in every case.

21         We're talking about the primary customer of our

22   competitor.  We're talking about a customer that we were the

23   primary supplier of and that they are now.

24         We're talking about a customer that is

25   substantial, substantial sales, and has a key relationship,

a long ongoing relationship with our client, and a fairly

long relationship -- I don't know how long -- with Zumbiel,

as well.

So we have a situation here where there's -- there

are a lot of delicate balances. And what that customer does

as far as decisions and purchases and long-term contracts

and what it enters into are made based on relationships,

pricing, what -- things that happen over time.

And if Zumbiel -- and we have testimony from

Monday that Zumbiel is not paying -- is not -- certainly not

paying a royalty on the Zipper Pack. And if it were paying

a royalty on the Zipper Pack, it would either have to raise

its prices or lower its profits.

And right now Zumbiel -- Graphic Packaging has a

patent -- a patent portfolio of 1,000 pending patents.

Whereas, Zumbiel doesn't have a budget for patent

prosecution.

They are not investing in the intellectual

property at all, to the extent that Graphic is. And

those costs that Graphic has in that have to be passed on in

its price to its customers.

And the fact of the matter is that Zumbiel, we

believe, is offering a lower price on its infringing

products to -- to Dr. Pepper than Graphic can offer in

its -- in its corporate situation.

And, in particular, the -- one of the things
that's led us to conclude that is that the pricing that we
charge to larger customers than Dr. Pepper is more than the
price we're able to get from Dr. Pepper.

And the only reason that we can -- Zumbiel
couldn't meet the volume of those larger customers, but it
can -- it can undercut the price of Graphic if it's not
investing in intellectual property issues with -- with
Dr. Pepper, whereas, Graphic has that cost of the
intellectual property that override on its cartons, that it
has to recover some way or stop its intellectual property
pursuits.

So what Graphic tries to do is obtain the
intellectual property and then protect it. And if it's
unavailable to protect it -- if it has six-year lawsuits
with Zumbiel -- and, frankly, Your Honor, we didn't expect
that lawsuit to be that long at all.

THE COURT: I wouldn't think anybody would.

MR. WATKINS: No. And so we -- and that was when
re-examinations were just beginning to come of popularity.
And all of a sudden we said, Well, rather than racing to
trial, as we anticipated doing back then, and not seeking
the preliminary injunction, we -- we need to get -- we --
that's damaged us in ways we will never -- we'll never get
back.

1        And the same thing -- and I don't know how fast

2 this will go through your court.  My expectation is, from

3 what you're saying, it will go fast.

4        But if it's 18 months, if there's no injunction

5 granted or they post -- post bond or something, and there's

6 no injunction enforced while it goes up to the Federal

7 Circuit, then we're -- we're in a situation again where that

8 relationship with Dr. Pepper over the long term could be at

9 risk.

10        And that's -- that's -- the irreparable harm here

11 is not -- is not just -- it's not quantifiable in dollars.

12 And the fact that we don't know whether it would be

13 collect- -- whatever we might get in judgment would be

14 collectable is just another little point in their

15 irreparable harm situation.

16        THE COURT:  All right.  Let me -- I'm going to

17 have to -- because I want to give your opponent their time,

18 too.

19        Let me direct you -- and I don't know where it is

20 on your PowerPoint.  But let me direct you to the -- the two

21 issues that they led with.  And I -- and this is the thing

22 where I don't feel like -- that we have a lot of

23 development, because you took these depositions and you want

24 to file them and they don't want you to and so forth.

25        But I need to hear from you.  Because you're

asking me to enter a preliminary injunction. In order to enter a preliminary injunction, I have to make a finding you're substantially likely to prevail on the merits.

That means I have to make some determination with respect to these defenses that they've raised, the primary defenses of invalidity and unenforceability.

And they point out to me -- I believe it's the *Titan* case, that even though they're going to ultimately have to prove these by clear and convincing evidence, there's a lower standard of -- for them to have -- to have a defense that can defeat your substantial likelihood of prevailing on the merits in a preliminary injunction context.

And so I need to understand from you, as briefly as you can, on unenforceability and this invalidity what it is -- if I'm writing an opinion that grants your motion -- and I'm not suggesting by any means that's going to happen. But if I have to -- if I have to justify a motion or a ruling of substantial likelihood on the unenforceability and invalidity, what am I going to say?

MR. WATKINS: Well, Your Honor, the first thing I would say is receive and look at our verified reply to the counterclaim. That was filed a week ago last Tuesday.

THE COURT: I did read it. It -- it says -- if I'm -- you know, I didn't quite follow it all together, but

1  it basically said that the -- there was no need to -- and

2  this dealt with the '551 patent; is that correct?

3          MR. WATKINS:  They've only alleged

4  unenforceability directly against the '551, and then have

5  said that as a result of that the other patent -- the '003

6  is --

7          THE COURT:  And it had to do with whether your

8  patent counsel disclosed what they say was prior art, right?

9          MR. WATKINS:  That's part of their allegation,

10 yes.

11         THE COURT:  And they say that -- and if I recall

12 correctly under the -- under the unenforceability, there has

13 to not only be a failure to disclose, but it has to be done

14 with an intent to deceive, right?

15         MR. WATKINS:  Right.

16         THE COURT:  And your point is that it was

17 disclosed in other patents but it was not thought to be

18 material or relevant to the '551 patent; therefore, there's

19 no -- no issue; is that right?

20         MR. WATKINS:  Actually, Your Honor, that -- that's

21 a little bit off of what we're saying.  It's close.

22         THE COURT:  Okay.  Then you tell me.

23         MR. WATKINS:  All right.

24         THE COURT:  Because that's what I got out of it.

25         MR. WATKINS:  All right.  First of all, two of the

primary references they rely on are their own publications.
And they're not prior art.  And the fact that they're not
prior art, there's no obligation to disclose them, whether
they would have been material or not otherwise.

But the real -- the real key -- there is -- there
is a -- if you look at our motion to dismiss, or if you look
at the situation, they have not satisfied the fundamental
basic elements for inequitable conduct, even at a pleading
standard.

The *Exergen* case requires -- in order to even
plead it and get it in the case -- and it's not -- if that
motion to dismiss is granted, it's not even in the case --
requires that they give the who, what, when and where.

And, Your Honor, you focused on that precisely
near the beginning of this hearing, when you said it's
unclear to me is this -- is this -- who is Graphic's outside
counsel?  Who is the person that they're saying has done all
this stuff?

And they mention -- they mention a name in their
pleadings, but they haven't -- they haven't even alleged
any -- they only made conclusory allegations about intent to
deceive.

And they've not identified specific individuals
and times in their pleadings at all.  It's wholly inadequate
to even bring the issue before the court.

1          But having said that, the issue -- if it is

2   brought before the court and considered, and the verified

3   reply is considered, and it does have to be -- there's two

4   exhibits that need to be studied.  And that's Exhibit 2 and

5   Exhibit 3 to the verified complaint.

6          Exhibit 1 in and of itself is an invention

7   disclosure statement.  And that is the original disclosure

8   of the invention that matured into both the '551 -- into the

9   '551 patent and the sub-patent, the '003 patent.

10          The invention disclosure statement very clearly

11  shows, and has a picture which is in my slide show of the --

12  of the invention that was conceived on November 5th -- as

13  conceived on November 5th in the invention disclosure sure

14  statement, depicting it, showing all of the claims that are

15  at issue, and that that's the date of that invention.

16          In order for them to say prior art wasn't

17  disclosed, they have to have a publication that they rely on

18  that's earlier than November 5th.  The earliest publication

19  they rely on -- that's November 5th of 2002.

20          The earliest publication they rely on is their

21  original provisional application.  Now, that provisional --

22  they were never allowed in their applications to claim back

23  to that original date, because it didn't -- it didn't even

24  disclose in that provisional all the claims that they were

25  asserting in their patent.  And the patent examiner

1 repeatedly disallowed them even relying upon it.

2          But they're seeking to rely upon it here,

3 something that would not even normally be looked at or

4 examined because it didn't relate to the claims that they

5 asserted in those patents.  But they're seeking to rely on

6 it here.  But that provisional was filed on November 7th,

7 2002, two days after the invention disclosure statement of

8 Graphic Packaging.

9          So all of those arguments about invalidity, about

10 inequitable conduct that relate to their two applications

11 are totally out of the case.  There's no basis for them.

12          If you -- there's no evidence that they should be

13 considered as prior art if you look at the other prior art.

14 We provided Mr. Biddle for his deposition on Monday.  They

15 cross-examined him about it.  He identified it as being in

16 the business records and being maintained and created

17 contemporaneously and that's their normal practice.

18          So that -- that inequitable conduct argument and

19 the invalidity argument with regard to those two

20 applications is gone.

21          We do spend time, Your Honor, talking about how

22 it's not material anyway.  There's some -- they made some

23 arguments in their -- in their brief which are not supported

24 by the figure and the -- and the specifications disclosed.

25 Those are a little bit complex.  I could make them to you

1   now.  I would suggest that it's better to read those, if you

2   feel the need to get to them.

3           THE COURT:  No.  We don't have time to do that

4   right now.

5           MR. WATKINS:  Now, there's one other piece of art

6   they've cited, which is the Schuster -- Schuster patent

7   which was issued many years ago.

8           And the Schuster patent does predate and would be

9   prior art, in terms of the date in which it occurred.  And

10  it was cited by some of Graphic's counsel in other matters

11  in connection with the claims there.

12          But the Schuster patent -- the first thing the

13  court should understand with regard to Schuster is it is a

14  patent application relating to a handle, not a dispenser

15  opening at all.

16          And it has a -- just a little drawing in a figure

17  that refer- -- that shows a dispenser.  And it says in

18  its -- in the specifications that -- it's just pictured

19  there.  They don't -- they're not writing anything what

20  about it does or anything.  And it's something that's

21  already known in the art.

22          And so there's nothing in that picture that you

23  have -- you would have to rely on the picture according to

24  the standards of the MPEP in order to fully disclose the

25  structure and the operation of that -- of that opening.

1           And when you look at it -- and we've provided a

2   graphic in here, as well.  When you look at it, Your Honor,

3   we have an annotated graphic --

4           THE COURT:  On Schuster?

5           MR. WATKINS:  Yes, Your Honor.

6           THE COURT:  I'm looking at it, I think.  Is this

7   it?

8           MR. WATKINS:  Yes, it is, Your Honor.

9           Now, let me -- let me make sure you understand

10  what this drawing depicts first, so that you understand this

11  is an annotated -- we have annotated this drawing.

12          So this drawing is the exact photograph of

13  Figure 2 of the Schuster patent.  But it has added to it the

14  circular cans that are shown as dotted circles on the

15  right-hand side of the picture.  And it's also had added to

16  it the red -- the red lines and the measurements of the --

17  of the red lines, how far apart they are, and the other red

18  print on the page.

19          Now, the significance of this is that the entire

20  dispute here is about a dispenser, that when you tear it

21  off, the top corner of the carton -- tear it off of the end,

22  that it retains all of the cans, because there's a --

23  there's a portion of the end that exists after you tear off

24  the dispenser that holds the cans.

25          THE COURT:  Let me just be clear here.  Is the

1 allegation with regard to Schuster that it -- that it --

2 that it should have been disclosed, or that it is --

3 what's -- does that go to the invalidity or the

4 unenforceability?

5          MR. WATKINS:  Both, Your Honor.  They're trying to

6 argue that this is both an invalidity argument, but they're

7 also trying to argue that it was inequitable conduct for

8 this -- for this carton not to be -- or this patent not to

9 be disclosed.

10          THE COURT:  Okay.  I'm going to have to stop you

11 here, because I -- I want to make sure I'm fair to the other

12 side here.  I may give you a chance to come back up.

13          So if you want to -- I mean, if you're -- I know

14 you're kind of in the middle of this, but I really -- I just

15 really need to give them some time.

16          MR. WATKINS:  I absolutely understand that, Your

17 Honor.  What I would like to do is just -- I have, for

18 example, the -- Plaintiff's Exhibit 1, which I said -- the

19 e-mail I had reported to you -- I've got a copy of that.

20          THE COURT:  That's fine.

21          MR. WATKINS:  I have a -- a book of -- of

22 documents.

23          THE COURT:  I tell you what, I'll let you organize

24 that while I hear from your opponent here.

25          MR. WATKINS:  It's organized, Your Honor.

 1          THE COURT:  Okay.  That's fine.  Do they have it?

 2          MR. WATKINS:  I'm handing it to them right now.

 3 This is a...

 4          THE COURT:  That's what we need, is more paper.

 5 Okay.  All right.

 6          MR. WATKINS:  That does have the e-mail in it as

 7 one of the last three documents, Your Honor.

 8          THE COURT:  All right.  Thank you, sir.

 9          All right.  Who's going to argue for Zumbiel?

10          MR. AHRENS:  That would be me, Your Honor.  Greg

11 Ahrens.

12          THE COURT:  Mr. Ahrens.

13          MR. AHRENS:  It seems as though, based on the way

14 the argument was just going with Mr. Watkins, that -- I was

15 actually going to stand at that lectern, because there's an

16 ELMO.

17          THE COURT:  That's fine.

18          MR. AHRENS:  But I also have just a small book --

19 I'm not a fan of PowerPoint, so I don't have a PowerPoint.

20 But I do have a small booklet with a few things.  And rather

21 than use the ELMO, I'll just provide you a copy.

22          THE COURT:  That's fine.  Yeah.  I'm actually

23 interested often that in nonjury or hearing situations

24 people still want it up on the big screen, even though I

25 can't even see the screen.  And so this is probably a better

1  way to do it.

2          All right.  Go ahead, sir.  And I -- at some

3  point, depending -- I want to give you equal time.  At some

4  point I may take a break, but I'll give you the same amount

5  of time I gave your opponent.  So go ahead.

6          MR. AHRENS:  Would your staff appreciate an

7  additional copy?

8          THE COURT:  Sure.  They always would.  You can

9  give it to Mr. Schmitt there.

10          MR. AHRENS:  I apologize.  There's a typo on the

11  very -- cover sheet.  It says preliminary hearing exhibits.

12  It's meant to say preliminary injunction hearing exhibits.

13  The --

14          THE COURT:  As long as you didn't spell your

15  client's name wrong it's all right.

16          MR. AHRENS:  No, no.

17          THE COURT:  All right.

18          MR. AHRENS:  The Wood, Herron & Evans firm is in

19  Cincinnati.  And we are not bulldogs.

20          THE COURT:  All right.

21          MR. AHRENS:  I believe that the pack that was just

22  handed to you -- I'm not sure, actually, what's in it at the

23  moment.

24          THE COURT:  I haven't read it yet either, so we're

25  in the same place, so go ahead.

MR. AHRENS:  To the extent that it has materials
in it that are subject to our objection to their motion --
emergency motion, then we'd obviously keep that on the table
for your decision.

THE COURT:  Well, that's fine.  But, you know, the
truth of it is -- you know, I'm going to have to have
something on the defenses.

I mean, you all -- I mean, they -- they raised --
they filed their motion and -- you know, sometimes people
will anticipate what the other people are going to say.  But
they didn't, which is fine.  I wouldn't necessarily have
expected them to.

So then you lead with inequitable conduct and
invalidity.  And I'm going to need to hear what they have to
say one way or the other, so -- and I know you fussed at
them for not doing a reply.  But the time was kind of
compressed.

And so I'm -- I'm pretty -- I'm not really too
interested in -- in saying that people can't put in evidence
they want to put in in order to -- in order to tell me what
they think they need to tell me.  I mean, what was the point
in taking those depositions yesterday if people weren't
going to use them?

MR. AHRENS:  I totally understand that, Your
Honor.  I didn't set the schedule in this case.  I'm not the

1  plaintiff.  I didn't choose to file a preliminary injunction

2  and come in with what I came in with.

3         I'm the unfortunate person defending against it.

4  And the lack of urgency in the facts of the case, which

5  we'll get to here promptly, seems to pervade everything.

6         This is a shot over the bow out of the blocks in

7  September of 2010, a year -- a year to the day after Graphic

8  Packaging became aware of Zumbiel's Zipper Pack as a

9  proposed product to the customer, which I guess now has been

10 stated here as Dr. Pepper.  A year.

11        There's no urgency to wait a year to file a

12 complaint for patent infringement and seek a preliminary

13 injunction.

14        And as was learned in the deposition of

15 Mr. Zumbiel on Monday of this week, but not specifically

16 mentioned in detail here today, the Zipper Pack carton of

17 Zumbiel has, in fact, been on the market to the Kroger

18 Company, a large chain of grocery stores that originates out

19 of Cincinnati, for four-and-a-half years.

20        There has not been a single word uttered about how

21 Graphic Packaging has been irreparably harmed for

22 four-and-a-half years.

23        They obviously didn't even know about it until

24 Monday of this week when it popped up on the website.  So

25 that is absolutely antithetical to a claim of irreparable

1 harm as to the Kroger Zipper Pack product.

2          In fact, the Zipper Pack product, if you follow it

3 back to when it was introduced, I believe Mr. Zumbiel

4 testified approximately four years ago, is prior to the

5 issuance of the earlier of the two patents involved in this

6 suit.

7          The product was on the market being sold by -- to

8 a customer and then in the marketplace.  Then their first

9 patent issues.  Nothing is done.  Four years go by.

10          They get another patent issued a year after they

11 learn about the subsequent introduction of the Zipper Pack

12 to the Dr. Pepper company and then they file and they seek

13 an emergency relief in the form of a preliminary injunction.

14          Now, preliminary injunction is not a readily

15 granted remedy in a patent case.  And there's many reasons

16 for that.  But one reason is in recent years, after the *eBay*

17 decision out of the Supreme Court, which made it absolutely

18 clear that there is no longer a presumption of irreparable

19 harm in the context of permanent injunctions -- and I

20 believe we're the ones who cited to you the case that points

21 out that -- that also applies in the context of a

22 preliminary injunction.

23          So there's no longer a presumption of irreparable

24 harm.  It's something that has to be proven by the plaintiff

25 or the parties seeking the injunction.  And, here, what do

1  we have?  If you look at --

2          THE COURT:  The only hesitancy I had about that --

3  and I can't quote you chapter and verse, but -- maybe I can

4  quote you chapter and verse.  Let me get it here.  These are

5  some notes that we prepared for the hearing.

6          In *Broadcom Corp versus Qualcomm,* which is a 2008

7  Fed Circuit decision, they said -- the Fed Circuit -- it

8  remains an open question whether there remains a rebuttable

9  presumption of irreparable harm following *eBay.*  And that

10  was a published decision.

11          The decision that I think you're referring to is

12  *Automated versus Crane,* which is an unpublished 2009

13  Fed Circuit decision, where the Fed Circuit said that *eBay*

14  had discarded the presumption of irreparable harm.

15          And then it -- and then there's some other

16  district court cases.  But are you confident that there is

17  no longer a presumption of irreparable harm even in a

18  preliminary injunction context?

19          MR. AHRENS:  Not a presumption that completely

20  carries the day.  I mean, there certainly may be ongoing

21  viability to it being a rebuttable presumption at some

22  level.  But the plaintiff has to come forward with

23  something.

24          And here, if you look at Tab 12 and 13 in the

25  booklet that I gave you, these are simply two-page excerpts

1  from -- the first one at tab 12 is a -- literally, two

2  paragraphs in their preliminary injunction motion, two

3  paragraphs, supported by Tab 13, which is two paragraphs of

4  a declaration.  So a sum total of four paragraphs is the

5  evidence of alleged irreparable harm that is being relied

6  upon.

7      THE COURT:  Well, they told me they got some

8  better stuff at Mr. Zumbiel's deposition, I think it was.

9  And what about that?

10     MR. AHRENS:  Well, first of all, I don't think

11 it's proper to support your affirmative burden of coming

12 forward with evidence on an issue in essentially a reply

13 mode, because as this court's rules -- as this court's rules

14 don't permit a reply as a matter of course.  You can't be

15 certain you're going get a chance to reply.

16     And if you can't be certain that you're going to

17 get a chance to reply, you certainly shouldn't wait around

18 until you might get a chance to reply to try to support what

19 is otherwise a failure to meet an element.  And this is a

20 critical element.

21     Patent infringement cases -- there's obviously

22 lots of patent litigation.  You are handling a lot of it

23 yourself here in this court.  And money damages, whether it

24 be through lost-profit analysis or reasonable royalties, are

25 calculable.  It's possible to determine damages in a patent

1  case.  So you have to look to something else.

2          THE COURT:  Has it become -- has it become post

3  *eBay* impossible to get an injunction?  I mean, what kind

4  of -- what would be present in a paradigm case in which

5  preliminary injunctive relief would be authorized based on

6  irreparable harm, focused on irreparable harm?  What would

7  be in a paradigm case that's -- that's missing in this case?

8          MR. AHRENS:  I'll give you an example.  In

9  November -- I think it was the very beginning of November.

10  And I have the case in my briefcase, so I may pull it out

11  and give you the cite, because I'm not sure we cited it in

12  our brief, because it's not really supporting our position.

13  But it answers your question.

14          I think it's the *Astra-Zeneca* case, Federal

15  Circuit decision.  And what it did is it affirmed the

16  granting of a preliminary injunction in a patent case.

17          We probably cited a number of cases that reversed

18  the grant or affirmed the denial, which we're supporting our

19  position.

20          But in this case it was a -- an affirmance of a

21  grant of a preliminary injunction.  This is the

22  pharmaceutical industry.  These are the huge big pharma

23  companies.

24          You're talking about an amazing litany -- and it's

25  described in the case -- of how the pricing structure

through HMOs, physicians' offices, pharmacies, hospitals --
all the places that have to buy these drugs.  And you've got
a generic producer that's going to come into the market and
splatter the market with their generic product to eviscerate
the patented products market share.

You are probably very familiar with this scenario,
because it happens in the news occasionally.  Certainly,
it's the subject of big litigation.

One distinction is that as a matter of fact in a
pharmaceutical case the party that's going to introduce the
generic -- they have to file what's called an ANDA, an
Amended New Drug Application.

They're essentially -- or, actually, explicitly
admitting that the product is an infringement.  So you take
that issue of whether there's infringement or not off the
table.  Because it wouldn't even be an issue going forward.

But since it's a generic, they have to assert that
it basically is covered by the patent.  So that's a
distinction that we don't have with this case.

And, secondly, the court was very focused on the
huge disruption to the -- the whole industry for this
particular drug.  If they were allowed to come in the market
with the product and then later, after a trial and the
merits, found to be an infringer and the patent being valid,
and then have to pull it off of the market, you can imagine

 1 the disruption in all this pricing and all these people.

 2          We don't have that situation here.  We don't have

 3 anything like that.  We've got the Zumbiel company, who's

 4 been around since 1843, a very well-established, obviously,

 5 old-line family owned business, privately held, that has had

 6 a customer supply relationship with this very customer,

 7 Dr. Pepper, for 20 years.

 8          So contrary to what it was sort of alluded to,

 9 it's not like Zumbiel doesn't already have a relationship

10 with this customer, they're walking in, saying, Hey, we got

11 this brand new Zipper Pack, you know, we want you to shift

12 away from your relationship with our competitor, Graphic

13 Packaging, and bring it all over to the Zipper Pack.

14          Zumbiel has had a relationship with Dr. Pepper

15 well before the Zipper Pack, well before the other

16 mysterious two-by-six cartons that are the subject of the

17 Atlanta lawsuits that keep being brought up as either

18 relevant or are not relevant, depending on which issue

19 you're talking about.

20          And I will posit with you that it's not relevant.

21 What goes on in the Atlanta court is completely irrelevant

22 to what's going on here.

23          So Zumbiel may or may not -- because they've

24 gotten no instructions from Dr. Pepper to do anything with

25 the Zipper Pack.  They had a test market a year ago with

1  500,000 units.

2  Mr. Zumbiel's declaration outlines and confirmed

3  in the deposition taken by Mr. Watkins that if Dr. Pepper

4  said today -- or more than likely since they don't do a lot

5  of things right around the holidays to gear up and switch

6  over -- the big season is the summer, so they work forward

7  to that.

8  If they said in the first quarter of 2011, Hey, we

9  want you to change over and be ready to be full scale, it

10  would be this time next year before Zumbiel could meet that

11  capacity.

12  Well, okay, Zumbiel is already selling a

13  two-by-six carton to the customer, Dr. Pepper.  That could

14  switch over all that volume to the Zipper Pack.  But the

15  logic should end there.

16  But the thing that takes it to the level of

17  alleged irreparable harm is that not only will Dr. Pepper

18  switch over its supply of two-by-six cartons already

19  supplied by Zumbiel to the Zipper Pack, the momentum will

20  swing and it will also switch over all of the two-by-six

21  cartons that Graphic supplies to Dr. Pepper.

22  Where does that come from?  Have we heard a shred

23  of anything from anybody at Dr. Pepper on this point?  No.

24  Have we heard anything from Dr. Pepper at all as to when

25  this Zipper Pack launch is supposed to happen?  No.

1         What we have are these four paragraphs, which say

2  basically, Well, somebody last April of 2010 told us that

3  this would launch in the first quarter of 2011.  Okay.

4         Deposition of the GPI folks:  Have you asked since

5  then?  Have you gone back -- have you filed a lawsuit in

6  September with a preliminary injunction request in

7  October -- based on information you allegedly got in April,

8  have you updated your inquiry and said, Are you really going

9  to launch this 2011?  No.  We haven't asked that.  Well,

10  that's mighty curious and problematic, because it shows

11  that, a, there isn't diligence in figuring out what's really

12  going on in the -- in the customer's mind and in the

13  marketplace, but, b, it just shows that there's really kind

14  of a laissez-faire attitude about what's really going to

15  happen.

16         And if -- as we've heard from Mr. Zumbiel, or has

17  been represented to -- have been stated by Mr. Zumbiel and

18  is in his declaration, the customer has not given

19  instructions to switch to the Zipper Pack.

20         So on this hand we have GPI saying in its papers,

21  We were told in April that it's going to happen this

22  January, February, this first quarter.  And now we know in

23  reality that's not happening.

24         Okay.  So just as a point of reference -- so the

25  customer supposedly said one thing which now isn't actually

1 true or actually happening.

2          And so then the other argument is, The customer

3 also told us that they may switch their entire two-by-six

4 product line over to the Zipper Pack.  Well, why would we

5 believe that any more than we would believe this alleged

6 launch date?  We're not hearing it from anybody at the

7 customer.

8          You know, if they want to get an injunction based

9 on this customer's absolutely going to launch this product

10 and they're going to do it and they're going to switch over

11 the entire product line, then let's hear it from the

12 customer.  Let's not hear it secondhand hearsay speculation

13 from witnesses of GPI.  It just doesn't pass muster for

14 irreparable harm, especially not anything that's immediate.

15          At Tab 14, just a brief demonstrative exhibit,

16 just to show the timeline, in September of 2009, GPI, aware

17 of the upcoming Zipper Pack test market -- they identify --

18 apparently identify IP issues with respect to the '551

19 patent.

20          They even get a template, a drawing, from

21 Dr. Pepper of this product that's going to be test marketed.

22 Did they contact Zumbiel?  No.

23          And you can follow right along up until September

24 of 2010.  And at no time during that period was there

25 contact with Zumbiel.  All this is going through, you

1 know --

2      THE COURT: They said, I think -- if I got what

3 they were saying, they said that they wouldn't contact

4 you-all because of the ongoing Atlanta suit. And I guess

5 they were worried that you-all would file a declaratory

6 judgment action to their -- if I recall correctly, the term,

7 their strategic disadvantage. I'm not exactly sure what

8 that means. But that that's why they didn't contact you.

9 And I'm not sure -- what do you understand that to mean?

10      MR. AHRENS: Well, I understand that in the

11 context of the patent litigation if party A, who owns the

12 patent, contacts party B and says, Hey, I've got this

13 patent, you might be concerned about it or you've got a

14 product I'm concerned about -- the standard or the threshold

15 for that party B to file a declaratory judgment suit is --

16 has actually been lowered in the last few years. So there's

17 not much of a trip trigger required for a DJ action. And I

18 think that that's what they meant.

19      Well, okay, fine. Litigation strategy is what it

20 is. And you decide, Gee, we can't contact Zumbiel, even

21 though we know through the customer that they're doing

22 something and they're going to be doing something else and,

23 gee, we're letting all this time go by. And then they turn

24 around a year later and say, Urgent, got to have a

25 preliminary injunction. We've known about this for a year.

 1  But we didn't contact you because we didn't want you to sue

 2  us.  But, by golly, we wanted to preserve our rights to sue

 3  you and come into court seeking a preliminary injunction.

 4          It's just nonsensical that that should be

 5  permitted.  And what it fails on is -- obviously there's not

 6  a specific urgency requirement.  If this was a TRO I would

 7  hope it would be thrown out on its ears because of the lack

 8  of urgency.

 9          But preliminary injunction doesn't specifically

10  have a time constraint, in terms of urgency.  But there is

11  case law, and we do cite to it, that delays in seeking a

12  preliminary injunction can actually undercut the court's

13  opportunity to grant it, because it shows that there's not

14  the urgency.

15          Then we have this Kroger Zipper Pack situation

16  where the product's been on the market for four-plus years.

17  Is it -- should it be enjoined now?  Obviously, there's been

18  nothing represented about how that's harmed Graphic

19  irreparably.

20          THE COURT:  Let me ask you the question that I

21  asked your opponent.  Let's assume that preliminary

22  injunctive relief is denied and -- well, I guess we could

23  assume it was granted.  It doesn't really matter.

24          From today to trial what needs to be -- what would

25  need to be done?  And, reasonably, how long would it take to

1  do it?  And, reasonably, how long would the trial take?

2          MR. AHRENS:  I think --

3          THE COURT:  And, by the way, was it your -- was a

4  jury requested in this case, or not?

5          MR. AHRENS:  Yeah.

6          THE COURT:  Okay.

7          MR. AHRENS:  I think a week for a trial would be

8  probably sufficient.  You'd pointed out that you didn't

9  think there would be any *Markman* issues.  I don't want to

10 commit to that at the moment, because there may be some

11 disputed -- on some of these issues of -- when you talked

12 about the prior art with Mr. Watkins and the Schuster patent

13 and some of the prior art issues, as to whether a certain

14 reference meets a certain claim element, I have a feeling --

15 I have been in a lot of patent cases.  And there's only

16 really been one that's not had a *Markman* issue of some kind.

17          But I think it probably could be fairly well

18 focused.  But, I mean, to try it in the same time period

19 that we're talking about a potential launch, if the word was

20 given today of a year from now, easily done.  I think easily

21 done, you know, of course, depending on your own schedule

22 and all of that.

23          So, you know, I think that -- that the issues

24 which would be brought out at trial -- maybe some would be

25 brought out early on summary judgment.  You know, maybe

1  there's some issues of infringement or noninfringement,

2  validity, invalidity, inequitable conduct that the court

3  could treat early.

4        But ultimately there may be some issues that would

5  go to trial.  That is, in a year this case would be over --

6  or at least the trial would be before any full-scale launch

7  of any product is concerned.

8        And I must point out one other thing about this

9  whole urgency and some of the arguments being made.  The

10 loss of goodwill -- and this is at that Tab 12.  It's just a

11 page out of their brief.

12       One of the three things that are -- the alleged

13 irreparable harm is the loss of goodwill, namely an account

14 responsible for $24 million annually.  Okay?

15       That is -- would be the -- if this entire

16 switchover of the entire two-by-six product occurred.  So to

17 argue on the one hand, Gee, Zumbiel could start today and

18 start printing cartons, well, sure, they could.  But that,

19 starting today with the one SKU for the -- for 7-Up today

20 isn't what's going to supplant $24 million worth of

21 business.  It's the full-scale launch that couldn't occur

22 for a year.

23       So it's very disingenuous to argue, Gee, they

24 could start today, but what they could do today isn't what

25 would result in this alleged irreparable harm, if that is --

 1  makes sense to you.

 2          THE COURT:  Is this a -- I asked this just -- I

 3  don't mean it -- mean anything by it.  But is this -- is

 4  this a -- is Zumbiel confident that if the case goes to

 5  trial that they'll -- that it will prevail?

 6          And, if so, is it -- do you consider -- because of

 7  the way that you pled the case or the way that you

 8  responded, do you consider the defenses to be the primary

 9  feature of the case, or -- or are you going to be able to

10  show noninfringement?

11          MR. AHRENS:  Very good question.  I made a note

12  when you were talking to Mr. Watkins about this issue, that,

13  you know, we put the brief in in a certain order.  And I

14  certainly collaborated on the decision of what order to put

15  it in.

16          I think we could have started with the lack of

17  irreparable harm.  But just the way the factors play out,

18  it's, you know, the likelihood of success, and then as to

19  the three issues.  Because noninfringement is one of our

20  defenses.  Invalidity is one of our defenses.  And

21  unenforceability is one of them.

22          They were put in there.  I personally don't

23  ascribe greater weight to one or the other, that inequitable

24  conduct required sort of a bit more explanation with the

25  timeline and some of that.

 1          THE COURT:  And I guess what I was -- and I -- you

 2 know, I don't have any judgment about it at the moment.  I

 3 guess I'll have to have a judgment at some point, or at

 4 least a preliminary one, but -- unless I end up ruling on

 5 other grounds.

 6          MR. AHRENS:  That you could do.

 7          THE COURT:  I understand that's your position.  My

 8 experience so far, at least -- and I'm not -- you know,

 9 y'all do this every day and I only do it when people make me

10 do it.

11          But my experience with inequitable conduct is that

12 it's -- first of all, it's pretty tough to prove.  And,

13 secondly, it -- it tends to be -- I don't want to say a

14 throw-away.

15          It tends to be something that people always say

16 but hardly ever are able to prove.  And is this different or

17 is this going to be -- when I finally get to it, is it going

18 to be the same?

19          MR. AHRENS:  Well --

20          THE COURT:  And -- because I -- one of the things

21 I've found is that people who are accusing other people of

22 inequitable conduct when their conduct is examined, they

23 didn't do much different than the other folks did.

24          And people are always saying you should have told

25 the patent examiner this and you should have told them that,

1 and -- but, you know, it's one of those things -- and I

2 think -- I might be wrong.  But I think the Federal Circuit

3 has even said on occasion this isn't something we want to be

4 talking about a lot, right?

5         MR. AHRENS:  Right.  There's a very well-known

6 quote about it being a bane on the profession and all that

7 sort of thing.

8         THE COURT:  And so the fact that y'all led with

9 that as your opener led me to wonder how serious you are

10 about being able to defend this case.

11         MR. AHRENS:  I understand.  Well, I would like to

12 assure you that -- placing that first, please don't be led

13 to conclude that it's because the other things that came

14 after it are less believable and less meritorious.  If I had

15 thought that would be the implication, I would have

16 definitely put it at the end.

17         THE COURT:  Well, I mean, don't we always tell our

18 lawyers to go with your best argument first?  I mean, that's

19 what I tell anybody that I talk to in appellate work, in

20 trial work, in whatever.  You always go -- you always lead

21 with your best stuff, right?

22         MR. AHRENS:  I agree.  And so don't get me wrong

23 when I say that had I thought your belief about our other

24 defenses would be diminished by us putting it first that

25 means that I don't believe it's a strong defense.  I think

1  it's absolutely a strong defense.

2          In fact, we do have these other Atlanta cases.  We

3  have an answer in one of them -- it was filed the same week

4  or the week before this case was filed.  We have an answer

5  due on Christmas Eve.

6          And at this point in time, I'm not intending to

7  plead inequitable conduct as a counterclaim or defense

8  because I don't know -- have any facts to support that.

9          So there's a case where -- and I don't believe in

10  the Atlanta case that was filed in 2004 that we pled

11  inequitable conduct.  I don't recall it being pled.

12          So in my experience -- I've been trying patent

13  cases for quite some time.  And I have had -- maybe in the

14  last eight years, maybe eight -- seven or eight patent

15  trials.  And in every one I think, except for one,

16  inequitable conduct was actually an issue presented at

17  trial.

18          Now, it's a bench issue, not a jury issue, so --

19  but they've survived.  Now, that doesn't mean that out of

20  all the other cases that I've actually litigated,

21  inequitable conduct has either been appealed out or it was

22  never pled to begin with.

23          So I believe that when it's been pled and pursued

24  in good faith that it does go to the -- to the math.  And

25  I've had a jury -- or a judge find inequitable conduct and

1  toss the patent out and the --

2         THE COURT:  Don't misunderstand me.  I'm not

3  saying it's never going to be able to be proven.  I just --

4  my understanding of it is -- and I know we're on a

5  preliminary injunction.  So there's different standards.

6  But my understanding is that -- first of all, you've got to

7  eventually prove it by clear and convincing evidence.

8         MR. AHRENS:  Right.

9         THE COURT:  You've got to prove somebody actually

10  intended to deceive the patent office, right?

11         MR. AHRENS:  Right.

12         THE COURT:  And that it's tough to prove.

13         MR. AHRENS:  It is.  I agree.  It is tough to

14  prove.

15         THE COURT:  But I don't mean to burden you with

16  that.  I will say that when I saw that was your lead -- that

17  was your lead, I thought, Okay, well, this is their best

18  stuff.

19         MR. AHRENS:  Okay.

20         THE COURT:  And that's what I thought.  But if

21  it's not and if I'm wrong, then you can just tell me.

22         MR. AHRENS:  It's all good stuff.  It wasn't

23  intended to imply better or worse than any other.  The

24  second tab in -- or the first tab in this book is just a

25  brief demonstrative.  It kind of tries to summarize what

1   the --

2          THE COURT:  I tell you what I'm going to do.  I'm

3   going to make sure I give you your equal time.  But we've

4   been going at it a while.  So why don't we -- why don't we

5   take five minutes.  It's ten after.  Let's reconvene at 15

6   after, please.

7          MR. AHRENS:  Thank you.

8          COURT SECURITY OFFICER:  All rise.

9          (Recess, 11:09 a.m.  to 11:16 a.m.)

10         COURT SECURITY OFFICER:  All rise.  This Honorable

11  Court is now in session.  Please be seated.

12         MR. AHRENS:  Thank you, Your Honor.  That was a

13  perfectly timed break.

14         Before I forget, I want to say two things.  One is

15  I now have the cite for this *Astra-Zeneca* case, if you'd

16  like it, or I can just read it into the record.

17         THE COURT:  Sure.  That will be great.

18         MR. AHRENS:  Federal Circuit decided December 1st,

19  2010.  And it's 2010 U.S. App. LEXIS 22660.

20         THE COURT:  Okay.

21         MR. AHRENS:  Okay?  And then I also --

22         THE COURT:  And you're telling me that's a case in

23  which the Federal Circuit has affirmed the grant of

24  preliminary injunctive relief, which must have meant that

25  they affirmed the finding of irreparable harm.  And you --

1 you think I'll be able to look at that case and see --

2 immediately see the difference between that type of a case

3 and the case we have here?

4         MR. AHRENS:  Correct.  Correct.  I believe that

5 will provide some guidance.

6         THE COURT:  Okay.  Thanks.

7         MR. AHRENS:  And there is a -- a strong dissent --

8 it was a two-to-one decision.  So there was actually a

9 strong dissent, which may further illuminate the issue.

10        The other thing I wanted to mention is that there

11 was a little bit of a -- I don't want to call it an

12 aspersion cast on Mr. Zumbiel.

13        But, indeed, Mr. Watkins sent me an email and

14 said, Would you ask, you know, Mr. Zumbiel to get the answer

15 to these questions, and it was informal and that was fine.

16        But, you know, it wasn't a 30(b)(6) deposition.

17 There was no affirmative obligation for him to go and

18 investigate issues.

19        He certainly was telling the truth.  He was under

20 oath.  And if he didn't have an answer or didn't know some

21 piece of information about something in particular of the

22 Zumbiel company --

23        THE COURT:  And this had to do with the financial

24 strength of the company; is that right?

25        MR. AHRENS:  Right.

1          THE COURT:  And its ability to respond to a

2   judgment, which I guess is something that the cases talk

3   about, but --

4          MR. AHRENS:  I think the one case that's cited for

5   that in their brief -- if you look at it, it's like a

6   mom-and-pop type of an operation.  And they may not have two

7   nickels.

8          Zumbiel has been around since 1843.  They have

9   more than two nickels.  I don't know how many more than two

10  nickels they have.  I'm not sure Mr. Zumbiel knows that

11  either.  But it's not really relevant here.

12         The Atlanta case -- no.  It's a good segue to the

13  Atlanta situation.  So there's a two-by-six carton product

14  that's the subject of a lawsuit in Atlanta.  Now the subject

15  of two lawsuits, in fact.

16         And the two patents in suit were subject to

17  re-examination and initiated by Zumbiel.  One of the two --

18  that proceeding has concluded.  It's done.  A re-examination

19  certificate has issued.

20         And the product that's accused -- there's no

21  longer any live claims in that re-examined patent pertaining

22  to that carton.

23         There is one patent still alive.  Two claims that

24  were applicable to this carton.  And, indeed, this hasn't

25  even finished its course at the patent office.

1       The GPI filed a request for reconsideration --
2  excuse me, a request for rehearing before the Board of
3  Patent Appeals and Interferences.
4       Once that occurs, whether it's granted and there's
5  a rehearing or it's denied and then the time for appeal to
6  the Federal Circuit is ripe, it's certainly -- no earlier
7  than 30 days from today will it be ripe for appeal in the
8  Federal Circuit.  That's assuming that the procedure goes
9  forward now, or promptly.
10      And then it's my experience the Federal Circuit is
11 12 months.  Nine months, 14 months, somewhere give or take.
12 But it's a fairly lengthy period of time.
13      What would happen after that?  This is an appeal
14 of a patent office decision about the patentability or not
15 of certain claims.  So then the Federal Circuit is going to
16 rule.
17      Then the case is going to go back to the Atlanta
18 district court, where it's been stayed or administratively
19 closed for five years, four years.  Then the case is going
20 to be opened.  Then discovery is going to continue.  Then at
21 some point there will be a scheduled trial.
22      We're talking two, three years from now.  So to
23 postulate that Zumbiel is going to have some -- you know, be
24 on the hook for some large damage award in a case in Atlanta
25 that isn't even at any point in time now close to that stage

1 is just absurd.

2          And to use that to say that they wouldn't be

3 amenable to a damage award in this case, where they've sold,

4 you know, 500,000 test-marketed cartons -- so the damages in

5 this case as of the moment are probably -- let's see, the

6 value is around 50- -- $75,000 total value for the

7 $500,000 -- 500 units of cartons of royalty on that 10

8 percent, 5 percent, $3,000.

9          I will personally guarantee you that Zumbiel can

10 pay an award of $3,000.  I mean, I will go on that limb.  So

11 it's kind of ridiculous to say that that's a factor.  But as

12 in their brief, it's one of their factors.  It's one of the

13 three factors.  So that is really not a factor.

14          I'm digressing a little bit.  The two-by-six

15 carton that's the subject of this Atlanta case, in any

16 event, was redesigned in 2006, I think, sometime during the

17 re-examination proceeding.

18          So we're talking about a finite period of damages

19 that that case is going to be fought over.  Has nothing to

20 do with anything that's currently going on.

21          So here, again, we've got the tie-in to the claim

22 of irreparable harm and the loss of -- or the price erosion.

23 If you look at the argument that they make in the -- through

24 the declaration of Mr. Hoyme, at Tab 14 -- or, excuse me,

25 Tab 13, first line, Because of Zumbiel's current

infringement of Graphic's patents at issue in other
litigation, red flag number one, because of something that's
going on in an Atlanta lawsuit, GPI has been forced to do
something with its pricing of its two-by-six cartons.

Now, without a preliminary injunction in this
case, they would have to continue with that pricing.  Well,
how is that then caused by the Zipper Pack, the
yet-to-be-released Zipper Pack?  There's no relationship.
There's no causal relationship between the two at all.

And, you know, I didn't mention or bring up the
Atlanta case, but it was brought up.  So I just wanted to
clarify what the status of that case is.

Now, back to the question you had before -- right
before the break, and at Tab 1.  We had this chart.  And it
shows that the enforceability issue pervades the three
different patent claims that they used as their exemplary
claims in their brief.

The validity we focused on patent claim 23 from
the '551 patent.  And then the noninfringement we've had
positions for all of the claims.

So the fact that the enforceability issue crossed
all the lines may have been an explanation for why that was
put forward first.

But, in any event, our brief sets out -- and it's
explained in great detail, so we won't go through it all,

why at least as to -- claim 52 of the '551 and claim 1 of
the '003 patent -- the carton simply doesn't infringe the
claim.

And the carton that's up on your -- on your desk
there that I handed to you which has some -- some wording
and phrases attached to it, that is associated with one of
our exhibits.

So those -- that language -- and you're more than
welcome to leave that. Because, as you say, it's easier to
visualize something when you've got a tangible version of
it.

That does correspond with a photograph that is --
was submitted as Exhibit 12 to our opposition brief. So
it's not something that -- you know, I didn't give them this
actual carton before the -- the hearing, but they have had a
photograph of it. And they've had an unannotated version
for quite some time.

So, in any event, we have a strong argument and
it's set forth in our brief as to why those two claims
aren't infringed by the Zipper Pack carton.

As to the issue of substantial noninfringing uses,
bear in mind, again, this is an issue that -- it's the
plaintiff's burden to -- to prove or to demonstrate an
absence of substantial noninfringing uses.

It's not the defendant's burden to prove

 1  substantial noninfringing uses.  So what do -- we have from
 2  Graphic in their opening brief is one sentence -- one
 3  sentence in their brief that says, And these Zipper Packs
 4  aren't capable of anything other than being an infringing
 5  use.  It's just not true.  Now, a Zipper Pack that has --
 6          THE COURT:  Have y'all ever put anything else
 7  other than cans in these things?  I mean, I -- you know, I
 8  hear what you're saying, but -- I mean, if you had the
 9  patent -- if your client had the patent, wouldn't you want
10  it to be enforced against a contention that, Well, you could
11  put sand in it or you could put marbles in it or you could
12  put -- you could -- you could put it up on your deck and
13  have it -- let the wind blow around it.  But, I mean,
14  wouldn't -- there has to be some common sense applied,
15  right?
16          MR. AHRENS:  Of course.  Of course.  And there may
17  have been some facetiousness being stated in the deposition
18  when you mentioned marbles.  But the point is -- sure,
19  there's got to be a realistic --
20          THE COURT:  And I think you-all -- I think you-all
21  referenced juice boxes in your -- but the whole point of
22  this thing is that the cylindrical cans move down and you're
23  able to pull them out and they don't all fall out and all
24  that.
25          I mean, juice boxes -- at least the ones my kids

1  used to use -- I don't know if they've changed.  But they're

2  just like these rectangular things that would sit in there.

3  And it wouldn't make any sense, would it?

4      MR. AHRENS:  Well, part of the opening, as it's

5  called, on these cartons is to provide access so you can

6  reach into the carton and pull the product that's inside of

7  it out.

8      So, you know, sure, a box isn't going to roll

9  forward to the end of the carton where the dispensing end

10  is.  But it still would function as a dispensing end because

11  it's open.  And it's the ingress for or egress for the

12  content.  So --

13      THE COURT:  Is this really where you want to be?

14      MR. AHRENS:  I'm just saying that --

15      THE COURT:  I mean, sure, you could fish around --

16  you could fish around your hand in there and grab anything

17  that, you know, somebody put in there, right?  But that's

18  not really what we're talking about, is it?  I mean, is

19  patent law that unforgiving?

20      MR. AHRENS:  Patent law, in terms of the

21  requirements of a claim that talks about holding cylindrical

22  articles -- and if the carton is capable of being used for

23  noncylindrical articles, it doesn't infringe, and it doesn't

24  infringe on a contributory.

25      THE COURT:  And you would want your company --

your company would want to be held to the same standard? If

you had a patent that said exactly what theirs said and

somebody came along and said, We can copy it, we can do

exactly the same thing, because we're putting sand in it,

you'd think that was okay?

MR. AHRENS: I would like to -- I do agree with

you about there should be a line of reason. Here's the line

of reason between marbles and sand, which are fanciful and

really ridiculous, versus beverage inside of a primary

container.

You've got soda or beer inside of a primary

container, which is the can, and then you've got the

secondary package, which is the carton itself.

You've got juice, which is a beverage. And it's

in a different-shaped primary container, which is then put

into the carton. So we're not talking about marbles versus

cans. We're talking about, well --

THE COURT: You're talking about those little

juice boxes like this, that -- that are -- that are

rectangular that you put the little straw in and the kids

sip out of? Is that what you're talking about?

I mean, that's the kind of juice boxes that I know

about. And that's the kind that my kids used. And you're

telling me you can -- if, in fact, you could put some of

those -- those containers inside this thing, then that means

1 that that's a -- that would be a substantial noninfringing

2 use?  That's what you're telling me?

3          MR. AHRENS:  It absolutely would be a substantial

4 noninfringing use, because those are not cylindrical

5 articles, which is what the claim calls for, just like I

6 would say that --

7          THE COURT:  All right.  Then how would you write

8 one to do -- how would you write a claim to say what you

9 want to say without -- without saying cylindrical and

10 without talking about the cans?  Because that's what the

11 whole point of this invention is, isn't it?

12          MR. AHRENS:  I'll tell you exactly how I would say

13 it.  I would say it like claim 1 of the '003 patent.  It is

14 in one of their claims.  It says, All package comprising a

15 carton enclosing a plurality of containers.  It doesn't have

16 the cylindrical limitation.

17          They themselves found out and used their patent

18 counsel, their astute patent counsel, to write claims that

19 are in these very patents that just aren't limited to

20 cylindrical articles.

21          I didn't write the claim.  They did.  They chose

22 to put cylindrical in some claims and not others.  It's our

23 position that there is a noninfringing use.

24          THE COURT:  Okay.

25          MR. AHRENS:  I will move forward, though,

1  because --

2          THE COURT:  Okay.  I mean, I'm not ruling, but

3  I -- I'm skeptical.  But go ahead.

4          MR. AHRENS:  Okay.  So in this rubric of

5  likelihood of success, any one issue that they don't prevail

6  on is enough to deny the injunction.  If the claim doesn't

7  look like it's going to remain valid --

8          THE COURT:  But they're telling me -- and I just

9  want to make sure I understand.  Because I didn't

10 actually -- I should have, but I didn't go line up the

11 claims.

12          If -- if this substantial infringing -- if I were

13 to conclude that they were substantially likely to prevail

14 on this issue that you and I are just discussing, then --

15 then they're telling me I don't need to reach other issues

16 in order to find infringement.  Is that right?

17          MR. AHRENS:  As to -- and I'll use my chart,

18 because it's probably the easiest thing to look at.

19          THE COURT:  Which chart are you looking at?

20          MR. AHRENS:  It's at Tab 1.  It's just a little

21 roadmap of sort of the way the issues line up.  So they

22 identified three exemplary claims in their briefing.

23          THE COURT:  Right.

24          MR. AHRENS:  Patent claim 23 of the '551 patent.

25 We have this noninfringement defense which is based on this

1  substantial noninfringing use, what we were just talking

2  about.

3          Okay.  So let's say that you don't go with that

4  argument.  That doesn't mean that the case is over.  They

5  still have to overcome the hurdles of is the claim valid and

6  is the claim enforceable.

7          THE COURT:  Okay.  I understand.

8          MR. AHRENS:  They went across the board.

9          THE COURT:  I understand that.  Okay.  But that

10  does -- they would win on infringement, then?

11          MR. AHRENS:  Well, you would be not, I presume in

12  a preliminary injunction, actually finding infringement.

13  You would be --

14          THE COURT:  I would be finding a likelihood of

15  success.

16          MR. AHRENS:  Yes, a likely to succeed.

17          THE COURT:  And what I'm asking you if I find

18  they're likely to succeed with respect to claim 23, I

19  wouldn't need to even reach 52 and 1, right?

20          MR. AHRENS:  On the issue of?

21          THE COURT:  Infringement.

22          MR. AHRENS:  Well, I just want to be very clear

23  about this.  If you found that they were likely to succeed

24  on their infringement of claim 23 and that they were also

25  likely to succeed on the challenge to the validity and

1 enforceability --

2      THE COURT: I got that. I really do. I've got

3 it. I know that. I'm not talking about validity and

4 enforceability. I'm talking about infringement.

5      MR. AHRENS: No. You do need to address

6 infringements of all the claims.

7      THE COURT: Right.

8      MR. AHRENS: Because they're seeking an injunction

9 to enjoin us from infringing all of these claims. We've got

10 a defense -- a missing element defense for 52 and claim 1 of

11 the '003 patent, much more substantial, you know, technical

12 defenses in terms of the -- not the -- you know, the

13 noninfringing use type. So you definitely have to address

14 that issue. You have to go through this --

15      THE COURT: I thought the accused product -- if I

16 found -- and, you know, this is -- I'm very capable in these

17 patent cases -- even though I've done a number of them, I'm

18 very capable of going off the beam. So if I'm off beam, you

19 get me back on the beam.

20      But I thought the accused -- I thought the accused

21 product was -- the contention was -- is that it violated --

22 it infringed on claim 23 of the '551 patent.

23      And if I find they're substantially likely to

24 prevail on that, doesn't that mean they have -- they're

25 substantially likely to prevail on the issue of infringement

1 as to the accused product?

2          MR. AHRENS:  Yeah.

3          THE COURT:  Okay.  All right.  Go ahead.

4          MR. AHRENS:  I just didn't want it to be confused

5 with they also have to pass muster on the other two issues.

6          THE COURT:  Okay.  I got that.  Okay.  Go ahead.

7          MR. AHRENS:  So maybe the way of -- the flow

8 diagram would be is there infringement of claim 23?  Is it

9 valid?  Is it enforceable?

10          And then if that doesn't get them there, then

11 you've got to go to the next claim and go through the

12 analysis.  You could take it stepwise.

13          THE COURT:  Okay.  Got you.  All right.  Go ahead,

14 sir.

15          MR. AHRENS:  On the issue of inequitable conduct,

16 there's a timeline.  It sort of speaks for itself in terms

17 of the content.

18          THE COURT:  What tab is that, please?

19          MR. AHRENS:  It's at Tab 5, Your Honor.

20          THE COURT:  Okay.

21          MR. AHRENS:  Sorry.  Tab 4.

22          THE COURT:  Okay.

23          MR. AHRENS:  It was Exhibit 5 to our brief.  And

24 it shows what we view as a very significant pattern of

25 conduct, that the idea that -- you know, who are we talking

1  about isn't clear.

2        I mean, it says -- it shows right on here.  It's

3  the -- the same attorney over and over and over and over

4  again citing these references, the Zumbiel patent

5  application or patent publication and then the Miller -- or,

6  excuse me, the Schuster patent.

7        And the thing that I find the most disingenuous

8  about the arguments made in Exhibits 2 and 3 to the reply to

9  our counterclaim, which are a sum total of 15 single-spaced

10  pages of, effectively, briefing, is that, Gee, these

11  references aren't material at all.

12        Well, if you look at the very last block to the

13  far right-hand side, these very references that aren't

14  material at all were cited by this very same attorney in the

15  other one of the two patents in this lawsuit, which is a

16  continuation of the patent that we're talking about.

17        So it baffles me how it can be immaterial all the

18  way through one application and then the sibling or the

19  child application they're citing.  It's incredibly baffling

20  to me.  And that, to me, depicts an intentional deception of

21  the patent office by not citing it when -- it's not that

22  this is a case where --

23        THE COURT:  Why would you -- why would you

24  intend -- why would you withhold information in one patent

25  and then disclose it in another that was a -- a related

1  patent?  And, I mean, why -- why would you do that at all?

2  I mean, why would you ever do that?

3  　　　　MR. AHRENS:  It happens.  It definitely happens.

4  I believe one of the reasons that this lawsuit was put off

5  for a year after they found out about our product was

6  because the only patent they had was the '551 patent, which

7  is the one that's subject to these attacks.  And the '003

8  didn't issue until August of 2010.

9  　　　　Knowing that there was problems with this earlier

10 patent, they waited -- consciously waited until they could

11 get the '003 patent to issue, and they made sure to cite

12 everything to the patent office so they would have an

13 absolutely clean nose with regard to the issue of

14 enforceability.

15 　　　　THE COURT:  And what's the -- and I recognize

16 we're not trying the case.  But even if I were to determine

17 that they should have done it, don't I also have to find

18 ultimately that they intended to deceive the patent

19 examiner?  How do you -- how does that work?

20 　　　　MR. AHRENS:  Well, there is a -- a balancing test

21 that the courts apply.  And rarely do you get an attorney or

22 a company to say, Gee, I admit that I intended to deceive

23 the patent office.  I'm not sure that I've ever seen a case

24 where somebody actually admitted it.

25 　　　　So there's this balancing scale, sort of like

1  this, that the more material piece of prior art is, the

2  lower the threshold of intent.

3       And I believe that the materiality of these

4  references, particularly Schuster -- I recognize there's now

5  been some cloud put over the Zumbiel application because of

6  the invention dates.

7       But certainly Schuster -- there's no doubt the

8  '991 patent is statutory prior art.  It was issued 20 years

9  ago.  It was known.

10      Now, they take -- make arguments about why it

11 doesn't actually anticipate or invalidate the claims.  But

12 the test isn't that ultimately the claims are invalid based

13 on the uncited prior art.

14      The test is whether the prior art was material to

15 patentability.  And, here, if you look at -- if we go

16 forward with their Exhibits 2 and 3 to the reply to the

17 counterclaim, where they've got this drawing of -- of the

18 Schuster patent, they take Zumbiel -- they take us to task

19 for one of our exhibits where we turned the figure around

20 and imposed some of the lines that were partially visible.

21      They take us to task and they cite the manual of

22 patent examining procedure, the MPEP, to say, You can't look

23 at the dimensions of a drawing.  They're not accurate.  You

24 can't rely upon that.

25      And then what do they do?  They superimpose.  He

1    shows it up the screen, these red circles that were supposed

2    to be cans.  They put in dimensions.  This was all done by

3    counsel.  And they're using that to distinguish this piece

4    of prior art on a validity side.  But they're saying what we

5    did is improper.  So it's very inconsistent to do those two

6    things.  And I realize we're probably getting close on time.

7            THE COURT:  We are a little close.  And I want you

8    to -- if you've got some great thing to tell me you haven't

9    told me, now is your time.

10           I'm going to give your opponent a brief response.

11   And then I think I have an idea of what I'm going to do

12   here.  But go ahead.

13         MR. AHRENS:  I think that the court should

14   discount any evidence submitted under the guise of the

15   reply.  I think the court should discount anything to do

16   with the Atlanta lawsuit.

17           I think the court should bear in mind that the

18   United States Supreme Court on the 29th of November, two

19   days ago, granted cert in the case of *Microsoft versus i4i*

20   -- that's little i, No. 4, little i -- *Limited Partnership*

21   to address whether the issue of patent invalidity truly must

22   be proved by clear and convincing evidence or whether it's

23   now possibly going to be a lower standard when the prior art

24   was not considered by the patent office.

25           That's actually a very relevant issue here,

1 because neither the Schuster nor the Zumbiel application

2 were cited to the patent office in the '551.

3          Should the Supreme Court lower the standard, then

4 the analysis here would be affected.  And, moreover, we do

5 not have to prove invalidity at this stage at all.

6          For us to prevail or show that they don't have a

7 likelihood of success is to demonstrate that our defenses

8 are meritorious and shouldn't just be thrown out as being,

9 you know, irrelevant or immaterial or lacking any substance.

10          I submit that our defenses on the merits of the

11 success in the case do have teeth and do merit the denial of

12 the injunction.  And the irreparable harm issue is -- is the

13 most troubling.

14          THE COURT:  You have to -- while the accused

15 infringer must prove invalidity by clear and convincing

16 evidence at trial, that is not the case at the preliminary

17 injunction stage.

18          This is your brief.  And you cite this *Titan Tire*

19 case.  And when I read this, I thought no wonder people

20 don't like lawyers.

21          When analyzing the likelihood of success factor,

22 the trial court, after considering all the evidence

23 available at this early stage of litigation, must determine

24 whether it is more likely than not that the challenger will

25 be able to prove at trial by clear and convincing evidence

1 that the patent is invalid.  Right?

2          MR. AHRENS:  Yes.

3          THE COURT:  So you have to prove by a

4 preponderance of the evidence that you're going to be able

5 to prove by clear and convincing evidence that the patent is

6 invalid.

7          MR. AHRENS:  I know.  It's -- it's a very

8 convoluted standard, but, nonetheless, that's what it is.  I

9 would also point out on the irreparable harm issue --

10 Graphic Packaging does not have a Zipper Pack.  They do not

11 have a product.

12          THE COURT:  They're not practicing their patent.

13          MR. AHRENS:  Right.

14          THE COURT:  And does that matter or not?  I don't

15 know.  I don't think it does, does it?

16          MR. AHRENS:  If this was a permanent injunction

17 and a company is a nonpracticing entity, in the sense that

18 they're not practicing their own invention, they would

19 absolutely be denied a permanent injunction based simply on

20 the fact that they're not competing in this space.  And so I

21 think it's relevant to consider.  They could -- you know,

22 they had years to develop a product.  And they haven't done

23 it.

24          THE COURT:  And let me ask you this.  It may not

25 be relevant either, just as a matter of interest to me.

1  Does your client have patents on some of its processes, too,

2  as well?

3         MR. AHRENS:  Absolutely.  Zumbiel maybe doesn't

4  have 1,000 patents.  But it has a number of patents issued,

5  has a number -- our company has been representing Zumbiel

6  for 50 years and we're a patent firm.  So, clearly, they

7  have intellectual property including patents.

8         THE COURT:  Okay.  Thank you, sir.

9         All right.  I'm going to give -- because it's your

10  motion, I'm going to give you a brief rebuttal period,

11  because it's going to be very brief, because I need to be

12  out of here by noon.  And I've got an idea of what I'm going

13  to do here in terms of how we're going to get this thing

14  resolved.  But I do want to give you a couple of minutes.

15  But it's probably going to have to only be that.

16         MR. WATKINS:  All right, Your Honor.  I will

17  certainly have us out before -- before noon.

18         THE COURT:  No.  I'll have us out before noon.

19         MR. WATKINS:  And I'll follow right along when you

20  say move, Your Honor.

21         THE COURT:  All right.  Go ahead.

22         MR. WATKINS:  I think it is telling, and the

23  court's noted, that there are two leading arguments that

24  they've led in with.  Number one, inequitable conduct.  And,

25  number two, that there's no alternative substantial use.

1          They indicated that it's our obligation to prove
2   something with regard to all of the claims.  The way the
3   case law reads -- and I just want to make sure I go on the
4   record on this -- is that if there's a single claim that is
5   upheld and is enforceable and is valid, then the injunction
6   should issue.
7          The patent -- they didn't mention the '003 patent,
8   which did not issue to August.  And so I think that leads
9   into -- and I ought to discuss briefly with the court the
10  timing question.
11         We've been accused of bringing this preliminary
12  injunction too soon and that there's no real threat of there
13  being a full-scale launch of Dr. Pepper until the end of
14  this year.
15         THE COURT:  And you also brought it too late.
16         MR. WATKINS:  And we also -- and --
17         THE COURT:  I know that's kind of hard to do,
18  isn't it?  But I -- but I -- I understand what they're
19  saying.  I mean, you've known about this for a year and you
20  didn't do anything.  And now it turns out maybe that nothing
21  is really going to happen much for a year.  So it may be
22  possible to be too soon and too late at the same time.  I
23  don't know.
24         MR. WATKINS:  Well, Your Honor, that's what they
25  postulate.  And I think that the response to that is that

1  we've acted reasonably.  And the way to tell that is that we
2  were informed initially by Dr. Pepper, Yeah, if they were
3  going to do a test market, they'd let us know about that.
4  We didn't hear about the test market until it was over.  So
5  we couldn't -- we couldn't stop that.
6         When we found out about the test market initially,
7  they were debating -- beforehand, they were debating whether
8  they would even launch it.  They were just going to see.
9  Afterwards they wanted to launch it.  And we -- we started
10 engaging with Dr. Pepper and telling them this -- we think
11 this violates our intellectual property rights.  We
12 explained that to them.
13        We thought they might hold off on that basis.
14 Then as the summer approached and our '003 came out, we
15 shared that with them and said, We still think that
16 infringes.
17        And as the declaration of Mr. Hoyme shows -- and
18 they included, Your Honor, at paragraph -- I'm sorry, at Tab
19 13, they said, The only two paragraphs that related to
20 irreparable harm -- well, number one, those two paragraphs
21 do relate to irreparable harm.  And we have not rested on
22 our presumption, though I think there is still some
23 presumption there.  We have come forward affirmatively with
24 evidence.
25        And, in fact, they left out paragraph 13.  And

1  that's contained in the book that I gave you at Tab 9.  And

2  on -- in the 13th paragraph of that, quoting briefly from

3  that, Furthermore, Dr. Pepper -- and this is Tod Hoyme

4  testifying, who handles a lot of the relationship at a

5  higher level with Dr. Pepper.

6          Furthermore, Dr. Pepper has on more than one

7  occasion expressed a willingness to terminate its business

8  with Graphic if Graphic does not agree to refrain from

9  enforcing its intellectual property against Zumbiel in

10 relation to the Zipper Pack.  My opinion is that Dr. Pepper

11 wishes to obtain a carton at the lowest possible price

12 regardless of any potential IPE issues.

13         I think that's certainly reasonable.  It's been

14 communicated to us by Dr. Pepper that they want us to not

15 assert our intellectual property rights and our business is

16 at risk.  And we proceeded with this to protect our

17 intellectual property rights because we value it and it is

18 at risk.  And that's certainly irreparable harm to us.  And

19 that paragraph was not included.

20         THE COURT:  All right.  I'm going to stop you.

21 Okay?  Because here's -- here's what I want to do.  I want

22 to -- I don't feel like we're quite teed up here on the --

23 on the defenses.

24         I'm not -- I don't think I'm going to be able to

25 go to your verified reply and try to -- and then put that

1  together with some deposition which I haven't even seen yet.

2  So here's what I'm inclined to do.

3          I'm going to go ahead and give you-all a post

4  hearing reply.  And I'm going to give Zumbiel a post hearing

5  surreply.  I'm going to put strict page limits on it.  And I

6  want the new information that is part of your verified

7  reply.

8          In other words, whatever argument you want to

9  transport into this reply, I'm going to let you do that.

10  But we can't -- you know, I'm going to put a page limit on

11  it.

12          And if you want to attach additional

13  documentation, including -- or file the depositions or

14  whatever -- whatever you think you need to do to bring it to

15  my attention, I'm going to let you do that.

16          And just so I'm not being unfair to Zumbiel, I'm

17  going give them a surreply, if they care to.  And then I'm

18  just going to take this under advisement.

19          I'm persuaded that I certainly don't need to act

20  today, which is, you know, unlike many preliminary

21  injunction situations that I deal with, where people need an

22  answer either today or tomorrow or the next day.  And I

23  just -- now that I'm seeing this, I don't see it quite that

24  way.

25          I don't know when I need -- you know, I don't

1 really -- it's hard for me right now to evaluate -- and I

2 guess that's part of the irreparable harm argument.  I need

3 to figure out whether you've shown irreparable harm or not.

4 But I'm not making any judgment on that at this moment.

5          The second thing I'm -- and so basically what's

6 going to happen is you're going to file a reply, they're

7 going to file a surreply.  I'm going to have it under

8 advisement.

9          I will rule just as soon as I can after that.

10 And, you know, it will be shortly, but it's not -- I don't

11 feel -- I don't feel like anything is particularly imminent

12 that hasn't been -- that is not -- that needs to be

13 redressed in the next week or two, for sure.

14          So I'm going to do that.  And I'll give you a

15 ruling on your motion for preliminary injunction.  At the

16 same time I'm going to require counsel to meet together in a

17 case management conference -- it can be by phone.  It

18 doesn't have to be in person -- and to file with the court a

19 proposed schedule.

20          If there's got to be *Markman*, it needs to be in

21 there, but it doesn't sound like there's much *Markman*.  And

22 then whatever, you know, expert deadlines you want to put in

23 there and summary judgment and a trial date.  And I will --

24 I will be about the business of issuing a trial order in

25 this case.

1          Because I think ultimately, regardless of how the

2   injunction turns out, I'm -- you know, this seems like a

3   case that should be tried sooner rather than later.

4          I think I can probably accommodate that in some

5   reasonable way if we're talking about a week.  And, you

6   know, my trial schedule is very booked up until April.

7   After that I've got trials scheduled every month.  And I

8   always have trials -- you know, criminal trials I have to

9   worry about.

10          But if we're talking about something that's, you

11  know, a reasonable amount of time after that, I'm -- I think

12  I can give you a trial.  And that's the thing that obviously

13  will decide the case if it gets that far.

14          I don't know.  Maybe y'all will settle.  Maybe --

15  maybe summary judgment practice will tell the tale.  I don't

16  have any way to know at this moment.  So that's what we're

17  going to do.

18          And, Mr. Watkins, I guess the question is:  How

19  long do you want to take for your reply?  And, really, it's

20  kind of your call.  I want it to be appropriate and, you

21  know -- and -- in other words, I want you to be able to say

22  what you want to be able to say by way of a reply.  And then

23  I want Zumbiel to say what they want to be able to say and

24  then I'll have it under advisement.

25          So how long would you need?  And I'm thinking --

1  because I -- you know, obviously, y'all can talk about this

2  all day long.  I'm thinking about limiting the reply to 15

3  pages and whatever attachments would go with that.

4         And I would assume the reply would point me to

5  specific places in the -- in the materials that you're going

6  to file, you know, so that I can not just have to deal with

7  the entirety of it.

8         How long would you need?  Is 15 pages sufficient?

9         MR. WATKINS:  Your Honor, given that we can

10 reference what's already made of record, I think 15 pages

11 is -- is sufficient.

12        I will say -- and the court's probably aware -- it

13 takes longer and more effort to write a shorter brief than a

14 longer one.

15        THE COURT:  Absolutely.

16        MR. WATKINS:  And I think that serves the court

17 better, as well.

18        THE COURT:  Absolutely.  And don't give me a lot

19 of these footnotes that violate the rule.  Matter of fact,

20 this is the truth.  In the contact lens case I finally

21 entered an order banning footnotes, because -- because I was

22 getting more footnote material than I was text.

23        And I was getting it in little bitty type, even

24 though that violated the local rule.  And I kept telling

25 them to knock it off and they wouldn't.  So I finally just

1  said, Just don't file them.  And it actually was great.  But

2  I won't -- I won't do that to y'all yet, but it's out there.

3         MR. WATKINS:  We don't have the advantage of

4  having contact lenses readily available in our case.  And it

5  looks like all counsel might could use bigger print, so...

6         THE COURT:  All right.  15 pages and when -- what

7  would be a reasonable time?  And, again, obviously, I'm

8  going to give you time.  I'm going give them a reasonable

9  amount of time.  I know we've got holidays.  And then I'm

10 going to try to get you a ruling as quickly as I can.  But,

11 you know, be -- be reasonable about what burden you put on

12 yourself.

13        MR. WATKINS:  Yes, Your Honor.  Two weeks would

14 seem appropriate to me, if it does to the court.

15        THE COURT:  All right.  That's fine.  Let me get

16 my calendar here.  So today -- is really -- today is

17 December the 1st, isn't it?  Wow.

18        So -- well, Mr. Ahrens already has something to do

19 on Christmas Eve.  So this may -- now he may have something

20 to do on Christmas Day.  Let's see what happens.

21        So today is December 1st.  December 15th would be

22 two weeks.

23        Mr. Ahrens, I'm thinking about maybe a ten-page

24 surreply or something like that.  Would that be all right

25 with you?  I'll go 15 if you really insist on it.

1              MR. AHRENS:  How about 12?

2              THE COURT:  Okay.  Say that again.

3              MR. AHRENS:  How about 12?

4              THE COURT:  All right.  12.  Good job.  And I'm

5    not going to -- you know, I'm not going to make you do it

6    during the holidays but I'm going to need it -- how about if

7    I give you -- if I gave you three weeks, so that would be

8    January the 6th, would that be acceptable?

9              MR. AHRENS:  That would be great.  Thank you.  I

10   promise we won't work on it the whole three weeks.

11             THE COURT:  I'm sure you won't.  That's why I --

12   so what I'm envisioning, then, is as of January 6, 2011, the

13   motion for preliminary injunction will be at issue.  I would

14   have it all briefed up.  I would have the benefit of

15   argument that I heard today.  And I will enter a written

16   ruling as promptly as I possibly can.

17             In the unlikely event I felt like further argument

18   was necessary, I would contact you and arrange that, either

19   by phone or in person, but I don't expect that to happen.  I

20   just want to make sure that I'm dealing -- you know, I've

21   heard a number of references here today to things that are

22   just not really before me in a way that I can get ahold of.

23   So I'm just going to give you the chance to do that.

24             And then as of January 6th I will require -- I

25   will consider the matter under submission.  And I will enter

1  a written ruling just as soon as I possibly can.  I'm not

2  going to get into issues of potential bond at this time

3  until I determine how I'm going to rule.

4         Obviously that would have to be something I would

5  have to deal with if I did grant the injunction.  And I will

6  do that as a separate matter if -- if injunctive relief is

7  granted.

8         The -- I'm going to ask you to get together with

9  each other and -- would it be unreasonable for me to ask for

10  that trial schedule -- proposed joint trial schedule to be

11  submitted by January 6th?  Would that be too unreasonable,

12  Mr. Watkins and Mr. Ahrens?

13         MR. WATKINS:  Your Honor, I'm happy to abide by

14  that time frame.

15         THE COURT:  Okay.

16         MR. AHRENS:  That would be perfectly fine.

17         THE COURT:  Okay.  So y'all talk to each other and

18  you give me a joint proposed trial schedule.  I know --

19  hopefully -- I really want you to agree on something and --

20  and I -- I don't -- I'm not asking you to rush.  I'm not

21  asking the defendant to rush.  I'm not asking the

22  plaintiff -- you know, I think a reasonable amount of time

23  is what I'm talking about.

24         And I think I'll be able to accommodate you.  So,

25  hopefully, you'll be able to agree.  In the unlikely event

1  you can't, then, you know, I'll note -- I guess you'll note

2  your disagreements and I'll impose a schedule on you

3  probably that neither one of you will like.  So -- so try to

4  agree, if you can.

5         Mr. Watkins, is there -- and I've got the

6  materials that everybody gave me today, which we'll -- I'll

7  consider as part of the materials.  I don't know what's in

8  this -- this.  And I don't know whether this is -- what --

9  what do I do with this?  And where did it come from?

10        MR. WATKINS:  Everything but the last four

11  exhibits I think are things that are just selected from the

12  preexisting record that I was going to be referring to.

13        THE COURT:  And does this include the new stuff

14  that they were objecting to, which I'm now going to permit

15  you --

16        MR. WATKINS:  Yes, it does.

17        THE COURT:  I tell you what, let me return this to

18  you and have you resubmit it with the reply.  Would you do

19  that, please?

20        MR. WATKINS:  Yes, Your Honor.  In addition -- in

21  addition, we have copies of the depositions here, but I will

22  submit those.

23        THE COURT:  No.  Submit those as a notice of

24  filing, so that way I'll have it all at once.

25        And, Mr. Ahrens, did you say I could keep this?

 1          MR. AHRENS:  If you would like it, Your Honor.  We

 2     have a -- a flat, which is called a blank.  And that's the

 3     erected carton.  Would you like both?

 4          THE COURT:  Sure.  I'll make those -- I'll make

 5     those your Exhibits 1 and 2 to the hearing.

 6          (Defendant's Exhibits Nos. 1 and 2 were received.)

 7          MR. WATKINS:  Your Honor, I do want to note for

 8     the record, those cartons are annotated in such a way to

 9     show that they do not comply with our preferred embodiment.

10     We don't think that has any relationship to the claim

11     itself, but that -- we would at least alert the court that

12     we would not agree with --

13          THE COURT:  Sure.  Well, and I'm probably not

14     going to use it for much other than to just be able to look

15     at something and get a general idea of what we're talking

16     about.  I'm not necessarily going to take this as the gospel

17     truth or anything.  But it does help me to at least be able

18     to see what we're talking about.

19          MR. WATKINS:  And I'm not objecting to you having

20     it.  I just wanted to make that point.  And one other.  The

21     blanks that were delivered to the customers, both Kroger and

22     to Dr. Pepper, were already preprinted with the products

23     that were going to be included inside.  And that's an

24     important concept for us in this blanket, is conceptual.

25          THE COURT:  And that went to your argument on the

 1 substantial noninfringing uses, right?

 2      MR. WATKINS:  Yes, Your Honor.  And there's one

 3 other thing that I would -- and I would invite opposing

 4 counsel to comment on this, as well.

 5      THE COURT:  Okay.  As long as you can do it in the

 6 next minute-and-a-half, go.

 7      MR. WATKINS:  I can do it in 30 seconds.  You

 8 suggested that we would alternatively be called in

 9 potentially -- unlikely but potentially, for oral argument

10 by phone or in person.  And I would like to register with

11 these complex types of patent issues that it be in person if

12 that's agreeable with --

13      THE COURT:  That's fine.  I think it's exceedingly

14 unlikely that I'll reconstitute the hearing.  But I just

15 wanted to let you know that it's possible.

16      MR. WATKINS:  All right.  Thank you very much.

17      THE COURT:  All right.  Anything else, Mr. Ahrens?

18      MR. AHRENS:  No.  Thank you very much.

19      THE COURT:  All right.  Thank you all for your

20 time.  I appreciate the help.  I'll hear from you and I'll

21 issue a ruling as soon as I can.  And I'll ask you to abide

22 by the dates.  I'm just going to put the dates that I've

23 given you into the minutes of the court, which you'll get.

24 There will not be a formal order issued.  But you know what

25 the dates are.  Okay?

1        MR. WATKINS:  Okay.

2        MR. AHRENS:  Thank you.

3        THE COURT:  Thank you.

4        (The proceedings concluded at 11:59 a.m.)

5                          - - -

6

**<u>CERTIFICATE</u>**


UNITED STATES DISTRICT COURT )
                             )
MIDDLE DISTRICT OF FLORIDA   )


        I hereby certify that the foregoing transcript is

a true and correct computer-aided transcription of my

stenotype notes taken at the time and place indicated

herein.


        DATED this 31st day of January 2011.



         s/Shannon M. Bishop
        Shannon M. Bishop, RMR, CRR