**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

GRAPHIC PACKAGING
INTERNATIONAL, INC.,

                    Plaintiff,

vs.                                                    Case No. 3:10-cv-891-J-99TJC-JBT

C.W. ZUMBIEL CO.,

                    Defendant.

_____

## ORDER

      Plaintiff Graphic Packaging International, Inc. ("Graphic") and defendant C.W.

Zumbiel, Co. ("Zumbiel") compete in the business of manufacturing cartons for beverage

cans.  Graphic filed suit against Zumbiel, alleging that a new Zumbiel carton infringes two

patents owned by Graphic:  U.S. Patent No. 7,134,551 (the "'551 patent"), and U.S. Patent

No. 7,780,003 (the "'003 patent").   This matter is before the Court for patent claim

construction, as described in <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir.

1995)(en banc), <u>aff'd</u>, 517 U.S. 370 (1996).  The Court has considered the submissions of

the parties, including the memoranda and exhibits (Docs. 47-50), as well as the argument

of counsel at the March 18, 2011, <u>Markman</u> hearing (Doc. 52).

## I.    **Claim Construction Standards**

      "When the parties present a fundamental dispute regarding the scope of a claim term,

it is the court's duty to resolve it."  <u>O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.</u>, 521

F.3d 1351, 1362 (Fed. Cir. 2008).  Patent claims are construed by the Court as a matter of

law.  Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454-56 (Fed. Cir. 1998)(en banc).

However, a court need construe "only those terms . . . that are in controversy, and only to

the extent necessary to resolve the controversy."  Vivid Techs., Inc. v. American Science &

Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999); see also U.S. Surgical Corp. v. Ethicon, Inc.,

103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of

disputed meanings and technical scope, to clarify and when necessary to explain what the

patentee covered by the claims, for use in the determination of infringement.  It is not an

obligatory exercise in redundancy.")

In claim construction, courts first examine the patent's intrinsic evidence to define the

patented invention's scope.  See Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir.

2005)(en banc).  This intrinsic evidence includes the claims, the specification, and the

prosecution history.  See id. at 1314-17.

Claim construction begins with the words of the claims themselves.  Amgen Inc. v.

Hoechst Marion Roussel, Inc., 457 F.3d 1293, 1301 (Fed. Cir. 2006); Phillips, 415 F.3d at

1312.  "[T]he words of a claim 'are generally given their ordinary and customary meaning.'"

Phillips, 415 F.3d at 1312 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582

(Fed. Cir. 1996)).  Such ordinary meaning "is the meaning that the term would have to a

person of ordinary skill in the art in question at the time of the invention."  Id. at 1313.

"Furthermore, a claim term should be construed consistently with its appearance in other

places in the same claim or in other claims of the same patent."  Rexnord Corp. v. Laitram

Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).

A "person of ordinary skill in the art is deemed to read the claim term not only in the

2

context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313.  Accordingly, "the specification is always highly relevant to the claim construction analysis." Id. at 1315 (quotation omitted).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  Id. at 1316.

"[W]hile claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) (quoting Sjolund v. Musland, 847 F.2d 1573, 1581 (Fed. Cir.1988)).  Importing limitations from the specification therefore "should be avoided unless the patentee clearly 'intends for the claims and the embodiments in the specification to be strictly coextensive.'" Pfizer, Inc. v. Ranbaxy Labs. Ltd., 457 F.3d 1284, 1290 (Fed. Cir. 2006) (quoting Phillips, 415 F.3d at 1323).

"In addition to consulting the specification, . . . a court should also consider the patent's prosecution history, if it is in evidence. . . . Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office ('PTO')] and the inventor understood the patent." Phillips, 415 F.3d at 1317 (quotation and citations omitted).

Although intrinsic evidence is preferred, courts may also rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980.  Technical dictionaries and treatises may help a court understand the underlying technology and the

manner in which one skilled in the art might use claim terms.  A court should use care when relying on such sources, however, since they may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  Phillips, 415 F.3d at 1321-22.

## II.    **The Patents**

The '551 and '003 patents are directed to a paperboard carton that is designed to hold cylindrical containers such as cans containing beverages.  This carton is formed from a blank—a flat sheet of paperboard that is designed with scores, cuts, and perforations that allow it to be folded in precise configurations.  When formed, the carton has a dispenser that allows containers to be removed individually while the remaining containers are held in place.

## III.    **Claim Construction**

### A.    **Disputed Terms of the '551 Patent**

#### 1.    **Detachable Portion (Claims 23, 33, 43)**

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Portion separable from the retainer portion along one or more tear line(s). (Doc. 48 at 4) | A portion of the carton that is completely separable such that it is no longer connected to the carton.  (Doc. 47 at 4) |

Claim 23 states, in relevant part, that the carton is comprised of: "a top panel, two side panels, and a bottom panel; at least one flap forming the first end of the carton and at least one flap forming a second end of the carton; the first end comprising a detachable portion and a retainer portion; the detachable portion removes an upper portion of the first end that is less than the diameter of the top row cylindrical article; and the retainer portion retains the

top row cylindrical article in the carton after the <u>detachable portion</u> is removed." ('551 patent col. 8, ll. 13-22) (emphasis added).[1]  The parties dispute whether the term "detachable portion" refers to a portion of the carton that is separable from the entire carton or is merely separable from the first end, such that it could be folded back along a different panel of the carton.

The claim language does little to indicate whether the "detachable portion" is separable from the entire carton or merely a section of the carton.  The claims state that "the <u>detachable portion</u> removes an upper portion of the first end" of the carton.  While the "detachable portion" is thus defined as a portion of the first end, the claims do not specify exactly what the "detachable portion" separates from—the first end or the carton.[2]  Based on the claim language, the most natural interpretation of the term would thus be a portion of the first end of the carton that is detachable from either the first end or the entire carton (including the first end).  <u>Cf.</u> <u>Inverness Medical Switzerland GmbH v. Warner Lambert Co.</u>, 309 F.3d 1373, 1379 (Fed. Cir. 2002) ("[A] word that has an ordinary meaning encompassing two relevant alternatives may be construed to encompass both alternatives.").

The specification does not use the term "detachable portion." In their claim construction briefing, however, the parties equate the term with the specification's use of the

---

[1] Claims 33 and 43 contain language that is identical in all relevant respects.  (<u>See</u> '551 patent col. 8, ll. 58-67, col. 9, ll. 35-46.)

[2] The general dictionary definition of "detach" advanced by both parties—"to separate especially from a larger mass and usually without violence or damage"—also does not favor either interpretation.  (Docs. 47 at 5, 48 at 7.)  Moreover, Zumbiel represents that the term does not have a meaning specific to the field of carton design.  (Doc. 47 at 5.)

term "dispensing flap 68."[3]   The specification clearly indicates that "dispensing flap 68," a

preferred embodiment of the "detachable portion," is separable from the entire carton.[4]

    While the preferred embodiments listed in the specification thus contain a "detachable

portion" that is completely removable from the carton, this limitation cannot be read into the

claims.  Nothing in the specification indicates that the invention is limited to this aspect of the

embodiments or that the embodiments and claims should be seen as "strictly coextensive."

Phillips, 415 F.3d at 1323.   Instead, the specification states:  "While the invention has been

disclosed in its preferred forms, it will be apparent to those skilled in the art that many

modifications, additions, and deletions can be made therein without departing from the spirit

and scope of the invention and its equivalents . . . ."  ('551 patent col. 6, ll. 9-13.)  The

specification thus does not limit the meaning of the term "detachable portion."[5]   The Court

---

[3] Zumbiel explicitly equates these two terms.  Moreover, at the hearing, Graphic stated that  "dispensing flap 68" is a preferred embodiment of the "detachable portion."

[4] For example, the specification states: "When the dispenser is opened, dispensing flap 68 . . . is removed from the carton . . . ." ('551 patent col. 4, ll. 31-32.)  Moreover, various portions of the specification, including each diagram, indicate that "dispensing flap 68" is opened from side panel 14 and thus detachable from side panel 14.  Because the claims already provide that the "detachable portion" is separable from the end of the carton, opening the dispensing flap in the manner provided by the specification would result in complete removal of the "detachable portion" from the carton.

[5] The Federal Circuit's decision in Rexnord is instructive.  In Rexnord, the parties disputed whether the term "portion" should have been defined as a part that was "separable from the whole" or a part that was "not separated from the whole."  The district found the term to be uncertain and thus relied on the preferred embodiments to choose between the two meanings.  Rexnord, 274 F.3d at 1343.  The Federal Circuit reversed, explaining that "[i]nstead of giving the term the full range of its ordinary meaning (which would encompass both readings), the district court incorrectly concluded that the term was uncertain."  Id. Likewise, in the instant case, the term "detachable portion" could refer to a portion that is separable from one end of the carton or a portion that is separable from the entire carton.

therefore concludes that a person of ordinary skill in the art would conclude that the term "detachable portion" broadly refers to a portion of the carton that is separable from either the entire carton or merely the first end of the carton.[6]

The term "detachable portion" is thus construed as follows: "<u>Portion separable from the retainer portion along one or more tear line(s)</u>."

### 2. Retainer Portion (Claims 23, 33, 43)

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Needs no construction<br><br>or<br><br>Portion separable from the detachable portion along one or more tear line(s). (Doc. 48 at 8) | A portion of the carton that keeps the cylindrical articles from falling out of the carton when the detachable portion is completely separated from the carton. (Doc. 47 at 6) |

_____

The Court gives the term "the full range of its ordinary meaning" by defining it to include both possibilities. <u>Id.</u> Moreover, because the term "detachable portion" can be given both meanings, this is not a case where resort to the specification would be appropriate to define an ambiguous term. <u>See id.</u> at 1343 (explaining that a term is ambiguous only where it "so deprive[s] the claim of clarity that there is no means by which the scope of the claim may be ascertained")(quotation omitted).

[6] This conclusion is reinforced by the prosecution history of the '551 patent. During prosecution, the applicant referenced a portion of U.S. Patent No. 4,498,581 as a "detachable portion" even though it remained folded and hinged to the carton. (Docs. 48 at 6-7, 48-2 at 3-4.) "When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning." <u>Arthur A. Collins, Inc. v. N. Telecom Ltd.</u>, 216 F.3d 1042, 1045 (Fed. Cir. 2000). Although Graphic has not argued that persons skilled in the art of carton design would place any specific meaning on the term "detachable portion," the prosecution history provides some evidence that the patentee understood the term to be consistent with a flap that remained attached to the carton in some manner. This intent, in turn, is relevant to whether the patentee intended for the claims and embodiments to be "stricly coextensive" under <u>Phillips</u>, 415 F.3d at 1323.

Zumbiel's proposed definition is unnecessary and places undue limitations on the term "retainer portion."  The claims themselves already specify that the "the <u>retainer portion</u> retains the top row cylindrical article in the carton after the detachable portion is removed." ('551 patent col. 8, ll. 21-22.)[7]  The first portion of Zumbiel's proposed definition would thus be redundant and would not help explain the scope of the claims.  <u>See</u> <u>U.S. Surgical Corp.</u>, 103 F.3d at 1568  ("Claim construction . . . is not an obligatory exercise in redundancy.") Moreover, because, as explained above, the "detachable portion" need not be completely separated from the carton, the second portion of Zumbiel's proposed construction is also inappropriate.  Because Graphic's proposed definition would do little to assist the jury in understanding the claims, the Court declines to construe the term "retainer portion."

### 3.    Removes, Removed, Removal (Claims 23, 29, 33, 39, 43)

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Needs no construction<br><br>or<br><br>Displac(es)(ed)(ement) from the place or position originally occupied. (Doc. 48 at 9) | Takes off; taken off; taking off.  (Doc. 47 at 8) |

Claim 23 of the '551 patent provides that "the detachable portion <u>removes</u> an upper portion of the first end" and that "the retainer portion retains the top row cylindrical article in

---

[7] Claims 33 and 43 contain language that is identical in all relevant respects.  (<u>See</u> '551 patent col. 8, ll.  66-67, col. 9, ll. 43-44.)

the carton after the detachable portion is <u>removed</u>." ('551 patent col. 8, ll. 18-21.)[8]

Moreover, claims 29 and 33 state that "the structural integrity of the [carton] is maintained

after <u>removal</u> of the detached portion." ('551 patent col. 8, ll.  41-43, col. 9, ll. 19-21.)

The term "remove" is not defined in the specification and does not have a meaning

specific to the field of carton design.  (Doc. 47 at 8.)  The general dictionary definition of

"remove" is "to move by lifting, pushing aside, or taking away or off."  (<u>Id.</u>; <u>cf.</u> Doc. 48-3 at

6 (providing a substantially similar definition).)

Zumbiel contends that the term "remove" should be limited to "taking off" because the

specification dictates that the detachable portion is "removed" by completely taking it off the

carton.  (Doc. 47 at 8-9.)  As explained above with reference to the term "detachable

portion," however, the specification language referenced by Zumbiel  merely references  a

preferred embodiment and thus cannot be imported as a limitation on the claims.  Because

the detachable portion of the carton may be "removed" from the retainer portion without

completely taking the detachable portion off the carton, Zumbiel's definition is not supported

by the intrinsic evidence.[9]

Graphic contends that the term "remove" need not be construed because it is

"sufficiently clear on [its] face and no special meaning or context is imparted through the

---

[8] Claims 33 and 43 contain language that is substantially similar.  (<u>See</u> '551 patent col.
8, ll.  63-67, col. 9, ll. 41-46.)

[9] The Court also questions whether Zumbiel's proposed construction actually conveys its
intended meaning.  It is not clear that substituting the words "takes off" for "removes" would
dictate that the removable portion is completely taken off the carton as opposed to merely
being taken off the first end of the carton.

specification and/or prosecution history." (Doc. 48 at 9.)   The term "remove" has a commonly understood meaning that, when used in conjunction with the remaining claim terms (as construed by the Court), requires no further construction.  The Court need not construe a term that has an ordinary meaning when reliance on such meaning resolves the parties' dispute.  Cf. O2 Micro Int'l, 521 F.3d at 1361 ("A determination that a claim term 'needs no construction' . . . may be inadequate when . . . reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."); see also, e.g., C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 863 (Fed. Cir. 2004) ("[W]e question the need to consult a dictionary to determine the meaning of such well-known terms.").  The Court therefore declines to construe the terms "removes, removed, removal."

### 4.    Upper Portion (claims 23, 33, 43)

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
| --- | --- |
| A region above a first (uppermost) turn of a tear line of the first end. (Doc. 48 at 10) | A portion of the first end located above the lower portion.  (Doc. 47 at 9) |

The claims state that "the detachable portion removes an upper portion of the first end that is less than the diameter of the top row cylindrical article."  ('551 patent col. 8, ll. 18-20, 63-65, col. 9 at 41-43.)  Although the parties  proposed alternative definitions of the term "upper portion" in their claim construction briefs, at the Markman hearing both parties stated that the term needs no construction.  Because "only those terms . . . that are in controversy" require construction,  Vivid Techs., 200 F.3d at 803, the Court declines to construe the term "upper portion."

10

### 5.    Obliquely (claim 52)

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| In a path that includes a segment that is neither perpendicular nor parallel. (Doc. 48 at 12) | Neither perpendicular nor parallel. (Doc. 47 at 10) |

Graphic and Zumbiel dispute whether claim 52's reference to a "tear line [that] extends . . . obliquely" describes a tear line which includes an oblique segment or a tear line which entirely runs at an oblique angle.  (See '551 patent col. 10, ll. 47-48.)   The specification does not use the term "obliquely," the prosecution history does not discuss its meaning, and the term is given no special meaning in the field of carton design.  (Doc. 47 at 10-11.)   The dictionary definition of the term "obliquely" is: "neither perpendicular nor parallel."  (Docs. 47 at 11, 48 at 12, 48-3 at 5.)

Graphic contends that this dictionary definition is incorrect because "it would exclude all of the figures of the '551 Patent from the scope of Claims 25 and 35." (Doc. 48 at 13.)[10] Claims 25 and 35 claim the cartons of claims 23 and 33, "wherein the retainer portion extends obliquely toward a lower portion of the first end." (See '551 patent col. 8, ll. 28-29, col. 9, ll. 6-7.)  According to Graphic, "the retainer portion is bounded by multiple segments, including perpendicular segments, parallel segments, and angular segments, not all of which run obliquely toward the lower portion of the first end." (Doc. 48 at 14.)  Essentially, Graphic argues that the retainer portions are right triangles which sit atop the lower portion of the first end, and thus, since only one side of a right triangle is formed by an oblique line, the retainer

_____

[10] Claims 25 and 35 are not being asserted in this suit.

11

portion "extends" toward the lower portion with sides that are oblique, parallel, and perpendicular.

Although "a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct," <u>On-Line Tech. v. Bodenseewerk Perkin-Elmer</u>, 386 F.3d 1133, 1138 (Fed. Cir. 2004) (quotation omitted), the construction proposed by Zumbiel would not exclude the preferred embodiments from claims 25 and 35.   The most natural reading of the phrase "wherein the retainer portion extends <u>obliquely</u> toward a lower portion of the first end" is that  the retainer portion "extends" obliquely from the side panel to the lower portion (or, in other words, the tear line forming the outer boundary of the retainer portion extends obliquely towards the lower portion).[11]   Under this reading of claims 25 and 35, Zumbiel's proposed interpretation of the term "oblique" would not exclude the preferred embodiment from the scope of the claims. Because neither proposed construction finds  support in the intrinsic evidence, the Court finds Zumbiel's interpretation, which is supported by the extrinsic evidence, to be superior.

The term "obliquely" is thus construed as follows: "<u>Neither perpendicular nor parallel.</u>"

_____

[11] Graphic apparently assumes that, for the retainer portion to "extend obliquely toward [the] lower portion," every side of the retainer portion coming into contact with the lower portion must be oblique with respect to the lower portion.  The Court finds that this is an unnatural reading of the language and that a person of ordinary skill in the art would not interpret the claim language in such a manner.  Moreover, even if the Court were to adopt Graphic's assumption, Graphic's proposed construction would not render claims 25 and 35 consistent with the preferred embodiment.  Under Graphic's construction, the claims would read:  wherein the retainer portion extends in a path that includes a segment that is neither perpendicular nor parallel toward a lower portion of the first end.  Such a construction would not be any more consistent with Graphic's assumption than the construction proposed by Zumbiel, since two sides of the retainer portion would not extend in a path that includes a line segment that is neither perpendicular nor parallel toward a lower portion of the first end.

**B.    Disputed Terms of the '003 Patent**

**6.    Corner (claims 1, 14, 23)**

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Region at or near the intersection of two or more planes. (Doc. 48 at 14) | The point where converging lines, edges, or sides meet. (Doc. 47 at 12) |

The claims state that the carton includes two ends with "four panels connected to the two ends, . . . [where] the first panel, the second panel, and the exiting end meet at a first <u>corner</u>; the first panel, the third panel, and the exiting end meet at a second <u>corner</u>." ('003 patent, col. 6, ll. 22-33.)  The parties dispute whether the term "corner" refers to the point where the panels meet or the region at or near such point.  The specification does not explicitly define the term "corner," and the prosecution history does not shed any additional light on its meaning.  (Doc. 47 at 12-13.)

Figures 2 and 3 of the '003 patent, however, indicate the location of the first and second corners with arrows which point to the location at which the panels and exiting end converge.  ('003 patent, Fig. 2, Fig. 3.)  The Standards for Drawings contained within the Rules of Practice in Patent Cases state: "Arrows may be used at the ends of the lines, provided that their meaning is clear, as follows: (1) On a lead line, a freestanding arrow to indicate <u>the entire section</u> towards which it points . . . ."  37 C.F.R. § 1.84(r)(emphasis added).  Graphic contends that, because the arrows in Figures 1 and 2 indicate "the entire section" of the corner under § 1.84(r), the corner must be defined to include more than a single point.

The common dictionary advanced by the parties defines "corner," in relevant part, as

either (1) "the point where converging lines, edges, or sides meet" or (2) "the angular part or space between meeting lines, edges, or borders near the vertex of the angle." (Doc. 48-3 at 9.)  Graphic contends that, given the intrinsic evidence, the second dictionary definition "best reflects the intended meaning of 'corner' in the context of the '003 Patent." (Doc. 48 at 16.)  Graphic, however, proposes a construction that is significantly different than the dictionary definition on which it relies.  While the dictionary definition refers only to the space between the meeting panels and exiting end, Graphic's interpretation would include the region near the intersection of the panels and exiting end.

Graphic's interpretation is unpersuasive for at least two reasons.  First, it finds little support in the specification.  Under § 1.84(r), an arrow refers to the "entire section" towards which it points.  The arrows used in Figures 2 and 3 thus refer to the "entire section" of the corners.  This, however, does not suggest that the term "corner" has any particular meaning, as there is no reason that the "entire section" of the corner cannot be a point.[12]

Second, even if Graphic's proposed definition found support in the specification, it is

---

[12] For example, if the term "point" had been used instead of "corner", reference to the "entire section" of a "point" through the use of arrows would not somehow change the definition of a point to include the region near the point.  The most that can be said is that the patentee could have used lead lines without arrows if he understood a corner to be a point rather than a region.  While this is certainly true, nothing would have required him to do so.  Because the use of arrows is perfectly consistent with a corner being a point, the patentee may have simply chosen to use arrows for stylistic purposes or to assist the reader.  Moreover, although the Standards for Drawings contained within the Rules of Practice in Patent Cases can be helpful in construing patents, see, e.g., Heraeus Electro-Nite Co. v. Midwest Instr. Co., No. 06-355, 2007 WL 3274147, at *5 (E.D. Pa. Nov. 1, 2007), there is no reason to think that a person of ordinary skill in the art would believe that the meaning of the term "corner" was affected by the use of arrows in Figures 2 and 3 as opposed to lead lines.

14

not consistent with the language of the claims.  Graphic's interpretation focuses on the term "corner" without reference to the surrounding claim language.  The claims state that the panels and exiting end "meet at a first [or second] corner."  ('003 patent, col. 6, ll. 29-32) (emphasis added).  The only location at which the panels and exiting end "meet," is a single point; they do not "meet" over the span of a region.  Zumbiel's proposed definition, which, unlike Graphic's interpretation, also finds support in the extrinsic evidence, thus better comports with the surrounding claim language.

The term "corner" is construed as follows: "The point where converging lines, edges, or sides meet."

### 7.    Dispensing Flap (claims 1, 14, 23)

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
| --- | --- |
| Needs no construction<br><br>or<br><br>A part of the carton, defined at least partially by tear lines, capable of creating an opening in the carton to allow dispensing of containers from the carton. (Doc. 48 at 17) | That portion of the carton that is completely separated from the carton to facilitate dispensing containers.  (Doc. 47 at 13) |

The claims identify a "dispensing flap at the exiting end" of the carton "wherein all the containers are retained in the carton when the dispensing flap is separated along the first tear line."  ('003 patent, col. 6, ll. 40, 60-62.)   The parties dispute whether the term "dispensing flap" describes a portion of the carton that must be completely removed from the carton to facilitate the dispensing of containers.

Zumbiel contends the specification supports an interpretation of the term "dispensing flap" that requires complete removal of the flap from the carton.  Zumbiel points out that several of the figures of the '003 patent show complete removal of the dispensing flap and are described as such in the specification.  (See Doc. 47 at 13-14; '003 patent, Figs. 5-7, col. 3, ll.19-27.)  The specification further states that "[w]hen the dispenser is opened, dispensing flap 68, which includes top flap 42, is removed from the carton."  ('003 patent, col. 4, ll. 28-29.)

While the intrinsic evidence cited by Zumbiel indicates that the "dispensing flap" may be completely removed from the carton, further review of the '003 patent demonstrates that the term "dispensing flap" can also be used to refer to a flap which is not completely removed from the carton.  For example, when discussing U.S. Patent No. 3,265,283 as prior art, the specification states that "[t]he end wall of the carton has a dispensing flap which can be folded down upon opening."  ('003 patent, col. 1, ll. 45-46) (emphasis added).  The manner in which a term is used in the specification is evidence of how the same term is used in the claims.  See Nystrom v. TREX Co., 424 F.3d 1136,  1145 (Fed. Cir. 2005) (limiting the meaning of a claim term to the meaning consistently used in the written description and prosecution history).[13]  Moreover, although dependent claim 29 is not asserted in this case, it claims "[t]he carton of claim 23, wherein the dispensing flap is capable of being hinged along the second section."  ('003 patent, col. 8, ll. 52-53).  Zumbiel's proposed construction

---

[13] Zumbiel contends the use of the term "dispensing flap" in the prior art is not relevant because Graphic has not demonstrated that the term has a standard definition in the field of carton design.  (Doc. 49 at 11-12.)  Zumbiel fails to recognize, however, that the term is also used in the specification of the '003 patent to describe the prior art.

of the term "dispensing flap" would thus make claim 29 read as follows: "the carton of claim 23, wherein the [portion of the carton that is completely separated from the carton] is capable of being hinged along the second section."  Where possible, the Court will not adopt a construction that would render other claims internally inconsistent.[14]  The Court therefore rejects Zumbiel's proposed definition.

Graphic argues that the term needs no construction because "[t]he meaning of the term 'dispensing flap' is self evident by its use in Claims 1, 14, and 23 of the '003 Patent." (Doc. 48 at 17.)  This Court agrees and finds that the definition alternatively proposed by Graphic would do little to assist the jury because it would merely repeat language found elsewhere in the claims.  Because the Court has resolved the dispute between the parties by rejecting Zumbiel's more limited definition of the term, the Court declines to further construe the term "dispensing flap."

---

[14] Zumbiel contends that, under the doctrine of claim differentiation, it can be inferred that the dispensing flap in claim 23 is completely removed from the carton because, otherwise, claim 29 would be superfluous.  (Doc. 49 at 12.)  Zumbiel's argument is without merit.  First, if claim 23 specifies a dispensing flap that is either completely removed from the carton or folded along the carton, claim 29's limitation to a carton with a dispensing flap that must be folded along the carton would not be superfluous.  Second, Zumbiel ignores the fact that, under its proposed definition of the term "dispensing flap," claim 29 would be internally inconsistent.

### 8.    First Section and Second Section (claims 1, 14, 23)

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Needs no construction<br><br>or<br><br>A section of the dispensing flap (Doc. 48 at 19) | First Section:  A section of the dispensing flap located within the first panel (Doc. 47 at 14)<br><br>Second Section: A section of the dispensing flap located within the exiting end (Doc. 47 at 14) |

Claim 1 states:

> [T]he dispensing flap includ[es] a <u>first section</u> and a <u>second section</u>; the <u>first section</u> and the <u>second section</u> being connected along the first fold line; . . . the <u>second section</u> being defined at least partially by the first fold line, a first tear line, and a second tear line; the first tear line extending at least partially along and collinear with a second fold line; wherein the <u>first section</u> is defined at least partially by a third tear line and a fourth tear line; the third tear line extending from the first corner and the fourth tear line extending from the second corner; . . . wherein the third tear line and the fourth tear line converge towards each other from the first corner and the second corner, respectively, to at least partially define the <u>first section</u> . . . .

('003 patent, col. 6, ll. 40-59)(emphasis added).[15]  Because the first and second sections are portions of the dispensing flap which are "connected along the first fold line," one of the sections must be located on the exiting end and the other section must be located on a panel.  The language of the claims, however, does not indicate which section is located on the panel and which section is located on the exiting end.

Zumbiel argues that the location of the first and second sections can be determined

---

[15] The language of claims 14 and 23 is identical in all relevant respects.  (<u>See</u> '003 patent, col. 7, ll. 38-58, col 8, ll. 23-41.)

from the prosecution history.  The PTO rejected several claims under 35 U.S.C. § 112 for being indefinite and for failing to comply with the written description requirement.  (Doc. 47-7 at 4-5.)  In response, the patentee submitted an amendment that included a figure "for the benefit of the Examiner" which specified the location of the fold lines in relation to the first panel and the exiting end.  (Doc. 47-6 at 27.)[16]  Using the information provided in this figure, it can be determined that the "first section" is part of the first panel and the "second section" is part of the exiting end.

Although the inventor can "limit[] the invention in the course of prosecution, making the claim scope narrower than it would otherwise be," Phillips, 415 F.3d at 1317, there is no indication in the proposed amendment that the invention should be limited to the figure provided to the PTO. See Schwing GmbH v. Putzmeister Aktiengesellschaft, 305 F.3d 1318, 1324 (Fed. Cir. 2002) (stating that the prosecution history will only limit the scope of a claim when a competitor would believe "that the applicant had disavowed coverage of the relevant subject matter"); cf. Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1219-20 (Fed. Cir. 1995)(stating that amendments made in response to a rejection under § 112 that merely provide detail regarding the invention are "not presumed to raise an estoppel").  However, "[l]ike the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." Phillips, 415 F.3d at 1317.

The prosecution history, though, is generally seen as "less useful for claim construction purposes" than the specification. Id. This is  because "the prosecution history

---

[16] The amendment, however, was denied entry by the PTO and related to claims that were not issued in the '003 patent.  (Doc. 48 at 20.)

represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation" and thus "often lacks the clarity of the specification." Id. Because the location of the first and second sections can be inferred from the figures provided in the '003 patent,[17] Zumbiel's reliance on the prosecution history is unnecessary.

While the figures provided by the inventor support Zumbiel's interpretation, "the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration." Prima Tek II, L.L.C. v. Polypap, S.A.R.L., 318 F.3d 1143, 1148 (Fed. Cir. 2003). Moreover, "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words of expressions of manifest exclusion or restriction." Martek Biosciences Corp. v. Nutrinova, Inc., 579 F.3d 1363, 1381 (Fed. Cir. 2009)(quotation omitted). Nothing in the specification of the '003 patent or its prosecution history reveals such an intention. The Court therefore rejects Zumbiel's construction and declines to limit the claims to the configuration depicted in the figures included in the specification and prosecution history.

The Court also declines to adopt Graphic's proposed construction. The dispute

───────────────────

[17] The figures provided in the specification depict the first section as located on panel 14 and the second section as located on the exiting end. The claims state that the second section is partially defined by a first tear line which is "partially along and collinear with a second fold line." ('003 patent, col. 6, ll. 43-48, col. 7 at 42-46, col. 8 at 26-29.) The only tear line that extends "partially along and collinear with" a fold line in the figures of the '003 patent is located on the exiting end. The claims also provide that the first section is partially defined by the third and fourth tear lines, which converge towards each other from the first and second corners. ('003 patent, col. 6, ll. 56-59, col. 7 at 55-58, col. 8 at 38-41.) The figures depict the third and fourth tear lines, and thus the first section, as being located on panel 14.

between the parties relates to whether the first and second sections are necessarily located on specific locations of the carton.  Graphic's proposed construction—"a section of the dispensing flap"—would add nothing to the jury's understanding of the terms and, when inserted into the claims, could only create confusion.  Because the Court has resolved the dispute between the parties by rejecting Zumbiel's proposed construction, the Court declines to further construe the terms "first section" and "second section."  Cf. O2 Micro Int'l, 521 F.3d at 1361.

### 9.     Collinear with  (claims 1, 12, 14, 23, 32)

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Needs no construction<br><br>or<br><br>To some extent in a common line  (Doc. 48 at 21) | Lying on the same straight line as (Doc. 47 at 19) |

The claims state that the dispensing flap is defined at least partially by a first tear line which extends "at least partially along and collinear with" a second fold line.  ('003 patent, col. 6 ll. 40-48.)[18]  At the Markman hearing, Zumbiel agreed with Graphic  that, since the term "collinear with" has a straightforward and generally understood meaning, it needs no construction.  Because "only those terms . . . that are in controversy" require construction, Vivid Techs., 200 F.3d at 803, the Court declines to construe the term "collinear with."

---

[18] The other claims contain substantially similar language. (See '003 patent, col. 7 ll. 19-21, 44-46, col. 8 at ll. 27-29, 58-60.)

**10.    Separated  (claims 1, 14)**

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Needs no construction<br><br>or<br><br>Detached  (Doc. 48 at 22) | Disconnected or severed (Doc. 47 at 20) |

Claims 1 and 14 state that "all the containers are retained in the carton when the dispensing flap is <u>separated</u> along the first tear line."  ('003 patent, col. 6, ll. 60-62; col. 7 ll. 59-61.)  The term "separated" is not used in the specification or defined elsewhere.  Zumbiel contends that its definition is needed to make clear that the dispensing flap must be completely removed from the carton.  (Doc. 47 at 20-21.)  The Court, however, has already held that the "dispensing flap" need not be completely removed from the carton.[19]  Moreover, the term "separated" has a commonly understood meaning, and the proposed definitions would merely substitute synonyms that would do little, if anything, to aid the jury's understanding.  The Court therefore declines to construe the term "separated."  See <u>U.S. Surgical Corp.</u>, 103 F.3d at 1568 ("Claim construction . . . is not an obligatory exercise in redundancy.").

---

[19] It is also unclear how Zumbiel's definition would imply complete separation from the carton.  The dispensing flap could be "disconnected or severed" along the first tear line and yet remain connected to the carton at a different location.

**11.    Detachable, detached  (claims 4, 13, 27, 33)**

| Graphic's Proposed Construction | Zumbiel's Proposed Construction |
|---|---|
| Needs no construction<br><br>or<br><br>detachable:  capable of being separated<br><br>detached: separated<br><br>(Doc. 48 at 24) | detachable: completely separable from<br><br>detached: completely separated from<br><br>(Doc. 47 at 22) |

To support their proposed definitions of the terms "detachable" and "detached," the parties incorporate their arguments regarding the terms "detachable portion" and "dispensing flap," discussed above.  (Docs. 47 at 23, 48 at 24.) This Court has rejected Zumbiel's proposal to define the "detachable portion" as "completely separable" and the "dispensing flap" as "completed separated."  For similar reasons, the Court finds no support for limiting the definition of the term "detachable" to "completely separable." Moreover, "detachable" has a commonly understood meaning.  Because this commonly understood meaning does not include the modifier "completely," declining to construe the terms "detachable" and "detached" would resolve the dispute between the parties.  The Court therefore declines to construe the terms "detachable" and "detached."[20]

---

[20] The Court need not construe a term that has an ordinary meaning when reliance on such meaning resolves the parties' dispute. Cf. O2 Micro Int'l, 521 F.3d at 1361; see also, e.g., C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 863 (Fed. Cir. 2004) ("[W]e question the need to consult a dictionary to determine the meaning of such well-known terms.").  The lack of a need to construe the terms "separated" and "detached" is illustrated by the fact that Graphic proposes to define each term by reference to the other (i.e., Graphic proposes to define "separated" as "detached" and "detached" as "separated").

**IV.**    **Conclusion**

In summary, the Court's constructions are as follows:[21]

1.    "detachable portion"

> Portion separable from the retainer portion along one or more tear line(s).

2.    "retainer portion"

> No further construction needed.

3.    "removes, removed, removal"

> No further construction needed.

4.    "upper portion"

> No further construction needed.

5.    "obliquely"

> Neither perpendicular nor parallel.

6.    "corner"

> The point where converging lines, edges, or sides meet.

---

[21] Although the parties disputed the meaning of the term "pull-tab" in their claim construction briefs, they represented at the <u>Markman</u> hearing that the claims using the term "pull-tab" are no longer asserted in this case.

7.      "dispensing flap"

| No further construction needed. |
|---|

8.      "first section" and "second section"

| No further construction needed. |
|---|

9.      "collinear"

| No further construction needed. |
|---|

10.      "separated"

| No further construction needed. |
|---|

11.      "detachable, detached"

| No further construction needed. |
|---|

Moreover, the parties have agreed to the following definitions (see Doc. 47-4):

12.      "intermediate portion"

| An interior portion of the first panel spaced from fold lines |
|---|

13.      "marginal portion"

| A free edge |
|---|

14.      "converge towards each other"

| Move toward one another |
|---|

15.    "capable of being hinged along"

| May be turned or rotated about |
| --- |

16.    "means for facilitating separation of the dispensing flap"

| (means plus function claim under 35 U.S.C. § 112, ¶ 6)<br><br>structure: "pull tab or equivalent(s) thereof"<br><br>function: "facilitating separation of the dispensing flap" |
| --- |

Accordingly, it is hereby

**ORDERED**:

1.  Absent further Order, further proceedings will be consistent with this Order.

2.  The parties' Case Management and Scheduling Order will issue separately.


**DONE AND ORDERED** at Jacksonville, Florida, this 18th day of April, 2011.


TIMOTHY J. CORRIGAN
United States District Judge


js.
Copies to:

Counsel of Record